CONNECTICUT JUDICIAL BRANCH *v.*
GERMAINE GILBERT ET AL.
(SC 20514)

McDonald, Mullins, Kahn, Ecker and Keller, Js.*

*Syllabus*

Pursuant to statute (§ 46a-58 (a)), "[i]t shall be a discriminatory practice
. . . for any person to subject, or cause to be subjected, any other
person to the deprivation of any rights, privileges or immunities, secured

* This appeal originally was argued before a panel of this court consisting
of Chief Justice Robinson and Justices McDonald, Mullins, Kahn, Ecker,
and Keller. Thereafter, Chief Justice Robinson was removed from the panel
after argument and did not participate in the consideration or decision of
the case.

Connecticut Judicial Branch *v.* Gilbert

or protected by the Constitution or laws of this state or of the United States, on account of . . . sex . . . .''

Pursuant further to statute ((Supp. 2012) § 46a-86 (b)), ''upon a finding of a discriminatory employment practice, the [human rights referee] may order the hiring or reinstatement of employees, with or without back pay . . . .''

Pursuant further to statute ((Supp. 2012) § 46a-86 (c)), ''upon a finding of a discriminatory practice prohibited by section 46a-58 . . . the [referee] shall determine the damage suffered by the complainant . . . as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs.''

The named defendant, G, who is employed as a judicial marshal by the plaintiff, the Connecticut Judicial Branch, filed a complaint with the defendant Commission on Human Rights and Opportunities in connection with her allegations that another judicial marshal, M, had subjected her to severe and pervasive sexual harassment while they were stationed together at a particular courthouse. Specifically, G alleged that the branch discriminated against her on the basis of her gender by subjecting her to a hostile work environment, failing to investigate her allegations and to take remedial steps to protect her, and retaliating against her for making her complaint by reassigning her to courthouses farther from her residence. G claimed that the branch's misconduct violated the employment discrimination statute (§ 46a-60), as well as the general antidiscrimination statute, § 46a-58 (a), and Title VII of the Civil Rights Act of 1964, as amended by Title VII of the Civil Rights Act of 1991 (42 U.S.C. § 2000e et seq.), as a predicate for G's claim under § 46a-58 (a), insofar as § 46a-58 (a) includes within its ambit ''the deprivation of any rights . . . secured or protected by the . . . laws . . . of the United States . . . .'' During the administrative proceedings before the commission, the branch issued a request for the production of all of G's medical records, but G produced nothing in response. The branch then objected when G indicated that she intended to call her therapist and psychologist as witnesses in support of her claim for emotional distress damages. In an off-the-record ruling, the commission's human rights referee apparently ruled that, if G intended to pursue anything other than a garden-variety emotional distress claim, she must provide copies of her medical records. Because G had not produced all of her records at the time of the hearing on her complaint, the referee ruled that she could introduce evidence in support of her claim for garden-variety emotional distress but not medical records or other treatment related evidence of emotional distress damages. After the hearing, the referee found that G's claims were substantiated. In connection with the violation of § 46a-60, the referee awarded G back pay, as well as prejudgment and postjudgment interest on the back pay, pursuant to § 46a-86 (b). In connection with the violation of § 46a-58 (a), the referee awarded G attorney's fees and $50,000 in emotional distress damages pursuant to § 46a-86 (c). The referee also

Connecticut Judicial Branch *v.* Gilbert

ordered that the branch "give [G] the option of returning to the . . . courthouse" to which she assigned before she reported the harassment. On appeal to the trial court, that court rejected the branch's claims that the commission was not authorized to award attorney's fees and emotional distress damages to victims of employment discrimination under either § 46a-58 (a) or § 46a-60 and that the award of prejudgment and postjudgment interest against the state under § 46a-86 (b) is barred by the state's sovereign immunity. Nonetheless, the trial court agreed with the branch's claim that the referee improperly awarded G emotional distress damages in light of her failure to produce her medical records, allegedly in violation of the referee's discovery orders, and, accordingly, vacated the award of emotional distress damages. The trial court also vacated the injunction requiring the branch to allow G the option of returning to the courthouse to which she previously had been assigned, concluding that the injunction was an abuse of discretion and not properly tailored. From the judgment rendered thereon, the branch appealed and the commission cross appealed. *Held*:

1. The branch could not prevail on its claim that the trial court incorrectly had concluded that the commission was authorized to award emotional distress damages and attorney's fees in an employment discrimination action under the general antidiscrimination statute, § 46a-58 (a), and that statute's civil remedies provision, § 46a-86 (c):

   a. The commission did not exceed its authority under federal law by adjudicating a Title VII claim, that is, by holding a formal hearing to determine whether the branch had engaged in discriminatory practices in violation of Title VII: the United States Supreme Court previously had rejected the branch's argument that the federal statute (42 U.S.C. § 2000e-5 (f)) that allows for the bringing of a judicial action to enforce Title VII authorizes only courts, and not administrative agencies, to formally resolve Title VII claims, and that argument was unavailing particularly in light of the fact that the commission does not purport to formally adjudicate Title VII claims but merely identifies discriminatory practices under Title VII for purposes of applying state law; moreover, the fact that the federal Equal Employment Opportunity Commission itself lacks the authority to formally adjudicate Title VII claims does not indicate an intention to bar state agencies from identifying Title VII violations for purposes of determining whether state law has been violated, as there was a strong congressional preference, acknowledged by the United States Supreme Court, pervasive in the legislative history of Title VII, and reflected in Title VII's work sharing scheme, for resolving matters at the state level that involve the concurrent violation of Title VII and state employment discrimination laws; furthermore, this court rejected the branch's argument that allowing a state fair employment practices agency, such as the commission, to find and penalize Title VII violations under state law would upset a carefully calibrated federal scheme that balances the availability of remedies with important procedural protec-

Connecticut Judicial Branch *v.* Gilbert

tions and, instead, found persuasive the rationales of those federal courts that have considered the issue and concluded that, because § 46a-58 (a) explicitly adopts federal antidiscrimination law as part of the substantive conduct it regulates, when the commission finds a Title VII violation as the factual predicate to a violation of § 46a-58 (a), it does so as a matter of Connecticut law and, therefore, does not infringe on principles of federal supremacy.

b. There was no merit to the branch's claim that, even if federal law does not bar the commission from awarding damages for Title VII violations under §§ 46a-58 (a) and 46a-86 (c), the commission is precluded from doing so under state law, as construed by this court's prior case law: nothing in this court's precedent holding that state employment discrimination claims can be brought only under § 46a-60, the statute specifically dedicated to such claims, and not under § 46a-58 (a), the general antidiscrimination statute, indicated that the legislature intended to preclude the commission from awarding a remedy authorized by § 46a-86 (c) for a violation of § 46a-58 (a) predicated on a discriminatory practice prohibited by federal law; moreover, in light of the sweeping language of §§ 46a-58 (a) and 46a-86 (c), as well as a recent amendment (P.A. 19-16, § 7) making economic damages and attorney's fees available to a party who prevails on a state law claim of employment discrimination, this court refrained from reconsidering or extending that precedent, even though the legislative scheme may not create the most elegant framework for assigning different remedies to different discriminatory practices on the basis of the jurisdictional source of the injury.

2. The trial court incorrectly concluded that the state had waived its sovereign immunity with respect to the recovery of prejudgment and postjudgment interest on awards under § 46a-86, and, accordingly, the referee's award of interest was vacated: this court followed the "no-interest rule," as articulated by the federal courts and applied with equal force to the state under Connecticut law, pursuant to which, in the absence of an express waiver, the legislature is presumed not to have waived sovereign immunity with respect to prejudgment and postjudgment interest, and concluded that the state's waiver of sovereign immunity as to liability for civil rights violations under §§ 46a-58 (a) and 46a-60, and as to back pay and damages under § 46a-86 (b) and (c), did not constitute a waiver as to interest on such awards, as it was clear that the state has not expressly waived its immunity with respect to interest on such back pay and damages; moreover, the legislature did not waive sovereign immunity by necessary implication because, insofar as interest is not traditionally awarded as a part of damages, a statutory waiver of sovereign immunity only as to damages does not, by force of necessary implication, waive the state's immunity as to interest.

3. The trial court incorrectly concluded that the referee should have precluded G from recovering any emotional distress damages as a sanction for her refusal to produce her full medical records, and, because the

Connecticut Judicial Branch *v.* Gilbert

referee improperly admitted certain testimony that went beyond mere garden-variety emotional distress, this court reversed the trial court's judgment with respect to the issue of emotional distress damages, and the case was ultimately remanded to the commission for a new hearing in damages:

a. The trial court's decision with respect to G's claim for emotional distress was apparently based on its view that the referee, by restricting G to arguing for and recovering only garden-variety emotional distress damages, did not impose sufficiently stringent sanctions for what the trial court viewed as violations of a discovery order, and that conclusion was not supported by either the facts or the law: although G did not fully comply with the request for the production of her medical records, nothing in the record suggested that the referee issued an unconditional order requiring the production of the records, and G did not actually violate any discovery order, insofar as the referee essentially allowed her to opt either to produce her full medical records or to decline to do so and to seek only garden-variety emotional distress damages; moreover, the governing regulations afford the referee broad discretion over the sanctions to be imposed for violations of discovery orders, and, viewing the referee's order as such a sanction, this court concluded that the trial court failed to afford appropriate deference to the referee's oversight of the discovery process by effectively reversing the referee's sanction on that ground that it was too lenient; furthermore, it was clear that the referee did not consider G's conduct to be egregious or in bad faith, especially in light of G's efforts to find a compromise that would satisfy the branch's production requests while preserving her medical privacy.

b. The referee nonetheless abused her discretion by admitting certain testimony that went beyond mere garden-variety emotional distress, seemingly in violation of the referee's own rulings, and this court could not conclude that that error was harmless: on at least four occasions, and over the branch's objections, the referee allowed G or her husband to testify as to G's use of various over-the-counter and prescription medications to treat her insomnia and anxiety arising from the harassment, and such testimony was not merely evidence of garden-variety emotional distress but, instead, placed G's medical history at issue; moreover, only one of those references was struck from the record, the referee appeared to believe that the statements were potentially admissible and relevant, and admitting the challenged testimony when the branch had been denied access to G's medical records was an abuse of discretion; furthermore, insofar as the referee made several findings of fact regarding G's need for medication, this court could not conclude that the improperly admitted evidence did not factor into the referee's damages calculation.

4. The trial court improperly vacated the injunction requiring that the branch give G the option of returning to the courthouse at which she was originally stationed, as none of the concerns expressed by that court was sufficient to warrant vacating the injunction as a matter of law,

343 Conn. 90          APRIL, 2022               95

Connecticut Judicial Branch *v.* Gilbert

and the appropriate remedy was to remand the matter to the commission
for additional briefing, to hold a new hearing, and to potentially craft
a more narrowly tailored injunction: § 46a-86 (a) clearly grants the com-
mission the authority to issue reasonable injunctive relief tailored to
eliminating discriminatory practices and their effects, and, although M's
retirement in 2020 eliminated the possibility that G and M might be
assigned to the same courthouse, the primary purpose of reinstating an
employee who is transferred after complaining of sexual harassment,
such as G, is to vindicate the important public policy against punishing
victims who report abuse, and that purpose was served by the referee's
order regardless of M's retirement; moreover, even though the referee
did not expressly find that G's transfers were retaliatory in nature, the
referee's factual findings overwhelmingly pointed to a retaliatory animus
and an implicit determination that the transfers were pretextual, and
the trial court's assumption that G was not transferred on the basis of
retaliatory intent was therefore contrary to the referee's factual findings;
furthermore, if the branch did seek to retaliate or to resolve the pattern
of harassment by transferring G to a less convenient location while
allowing M to remain at the courthouse where the harassment occurred,
it was irrelevant that, under ordinary circumstances, the branch, as the
employer, has the discretion where to assign judicial marshals, and
allowing G to return to her original workplace was the preferred means
of vindicating the policy against punishing victims who report abuse,
and, to the extent that logistical considerations and the branch's opera-
tional needs are relevant to fashioning proper relief, this court instructed
that, before ordering the branch to reinstate G, on remand, the referee
must consider factors such as whether the branch's previous relocation
of G to other courthouses departed from the norms applied to other
marshals, whether the impact of keeping G at the original courthouse
on the operational needs of the branch outweighs the benefit to G of
being assigned to a courthouse closer to her home, and whether reinstat-
ing G will require the reassignment of other employees; in addition,
insofar as the trial court had been concerned about the apparently
unbounded nature of the injunction issued by the referee, this court
instructed that, on remand, the referee should clarify the scope and
duration of the injunction, whether the extent of the branch's misconduct
and the balancing of the equities warrant a permanent injunction preclud-
ing the branch from reassigning G, if a permanent injunction is not
warrant, at what point or under what circumstances the injunction will
expire, and whether, during the course of the injunction, the branch
may continue to assign G to other courthouses on a short-term basis
consistent with its operational needs.

Argued January 15, 2021—officially released April 26, 2022

*Procedural History*

Appeal from the decision of the defendant Commis-
sion on Human Rights and Opportunities awarding the

Connecticut Judicial Branch *v.* Gilbert

named defendant back pay and certain damages, brought to the Superior Court in the judicial district of New Britain, where the case was tried to the court, *Cordani, J.*; judgment sustaining in part and reversing in part the appeal, from which the plaintiff appealed and the defendant Commission on Human Rights and Opportunities cross appealed. *Reversed in part*; *vacated in part*; *further proceedings*.

*Colleen B. Valentine*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare E. Kindall*, solicitor general, and *Matthew Larock*, assistant attorney general, for the appellant-cross appellee (plaintiff).

*Michael E. Roberts*, human rights attorney, for the appellee-cross appellant (defendant Commission on Human Rights and Opportunities).

*Opinion*

ECKER, J. This case arises from allegations of sexual harassment brought by the named defendant, Germaine Gilbert (complainant), a judicial marshal who is employed by the plaintiff, the Connecticut Judicial Branch (branch). Following a contested public hearing before the defendant Commission on Human Rights and Opportunities (commission), the human rights referee (referee) found that the allegations were substantiated and awarded the complainant back pay with interest, emotional distress damages, attorney's fees, and injunctive relief. The branch appealed, and the trial court sustained the appeal in part. The court upheld the referee's determinations that (1) emotional distress damages and attorney's fees were available remedies under the state employment discrimination law then in effect if the complainant was able to establish a violation of Title VII of the federal Civil Rights Act of 1964, as amended by Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e et

Connecticut Judicial Branch *v.* Gilbert

seq. (2018) (Title VII), and (2) the state has waived its sovereign immunity with respect to prejudgment and postjudgment interest awards for civil rights violations, but also determined that (3) the award of emotional distress damages must be vacated because of the complainant's failure to fully comply with the branch's discovery requests in the administrative proceeding, and (4) the injunction reinstating the complainant to her former workplace must be vacated as overbroad and otherwise improper. The branch challenges the first two determinations on appeal; the commission challenges the latter two determinations on cross appeal. We affirm the judgment of the trial court with respect to the Title VII issue, reverse the judgment with respect to sovereign immunity, and remand the case for the referee to conduct a new hearing in damages and, if appropriate, to revisit the injunction reinstating the complainant to her former workplace.

The following background facts and procedural history are relevant. In 2012, the complainant brought a claim with the commission alleging that another judicial marshal, Gordon Marco, subjected her to severe and pervasive sexual harassment and unwanted sexual contact, potentially rising to the level of sexual assault, at various times between 2006 and 2012, while she was stationed primarily at the Danielson courthouse. The complainant alleged that the branch discriminated against her on the basis of her gender by, among other things, subjecting her to a hostile work environment, failing to adequately investigate her allegations, and failing to take adequate remedial steps to protect her. The complainant also claimed that the branch had retaliated by altering the conditions of her employment in response to her complaint. Most prominently, she alleged that, beginning in mid-2012, her supervisor, Russell Downer, reassigned her from Danielson, where she had been assigned since 2006, to the Willimantic and Putnam

Connecticut Judicial Branch *v.* Gilbert

courthouses, each of which was significantly farther from her residence. The complainant sought to hold the branch responsible for the alleged misconduct under three civil rights statutes: (1) Connecticut's employment discrimination statute, the Connecticut Fair Employment Practices Act, General Statutes § 46a-60; (2) Connecticut's general antidiscrimination statute, General Statutes § 46a-58 (a), which prohibits any person from depriving any other person of rights secured by law on account of the victim's membership in a protected class; and (3) Title VII, as a predicate to a further violation of § 46a-58 (a).

Following a public hearing before the commission, the referee found that the complainant's allegations were substantiated, a finding that the branch does not contest in the present appeal. The referee awarded the complainant seven days of back pay for the work time she lost while attending the public hearing, as well as prejudgment and postjudgment interest on the back pay award, all pursuant to General Statutes (2012 Supp.) § 46a-86 (b),[1] which provides remedies specifically for victims of discriminatory employment practices in violation of § 46a-60.[2] The referee also awarded the complainant $47,637 in attorney's fees and $50,000 in emotional distress damages pursuant to § 46a-86 (c), which provides remedies for violations of, among other things, the general antidiscrimination statute, § 46a-58. Finally, the referee granted injunctive relief, including an order that "[t]he [branch] shall give the complainant the option of returning to the Danielson courthouse."

The branch brought an administrative appeal pursuant to General Statutes § 4-183 (a), in which it contended

[1] Hereinafter, unless otherwise indicated, all references to § 46a-58 (a) are to the version in the 2012 supplement to the General Statutes. See footnote 3 of this opinion.

[2] It is not clear from the record whether the referee ordered interest at a rate of 5 percent or 10 percent.

Connecticut Judicial Branch *v.* Gilbert

that (1) under this court's holding in *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 680 A.2d 1261 (1996) (*Truelove*), prior to 2019,[3] the commission was not authorized to award attorney's fees and emotional distress damages to victims of employment discrimination under either § 46a-58 (a) or § 46a-60, (2) the award of prejudgment and postjudgment interest against the state under § 46a-86 (b) is barred by the state's sovereign immunity, (3) the referee's award of emotional distress damages also was improper because the complainant refused to provide the branch with her psychological and medical records, allegedly in violation of the referee's discovery orders, and (4) the referee exceeded her legal authority in ordering the branch to reinstate the complainant to her position at the Danielson courthouse.[4]

The trial court agreed with the branch's third and fourth claims and, accordingly, vacated the award of emotional distress damages and the injunction. With respect to the first claim, the court agreed with the branch that *Truelove* compels the twin conclusions that § 46a-60 is the exclusive statutory basis for remedying state law employment discrimination claims, and emotional damages and attorney's fees are unavailable for violations of § 46a-60 that occurred before 2019. But the court also determined that those remedies nevertheless remain available to a victim of employment discrimination seeking relief in proceedings before the commission because violations of federal employment discrimination laws—Title VII, in particular—are cognizable under

[3] In 2019, the legislature amended the Connecticut Fair Employment Practices Act to authorize the commission to award damages and attorney's fees, as well as equitable remedies for violations of state employment discrimination law. See Public Acts 2019, No. 19-16, § 7. Accordingly, complainants no longer need to establish violations of federal antidiscrimination law to obtain such relief.

[4] The branch raised additional claims of error before the trial court that are not before us on appeal.

Connecticut Judicial Branch *v.* Gilbert

§ 46a-58 (a), which, unlike § 46a-60, attaches to a remedies provision that includes economic damages and attorney's fees.[5] With respect to the second claim, the trial court disagreed with the branch and concluded that the state has waived its sovereign immunity as to prejudgment and postjudgment interest for civil rights violations.

The branch appealed[6] and the commission cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal and cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.[7] Additional facts and procedural history will be set forth as necessary.

I

REMEDIES FOR EMPLOYMENT DISCRIMINATION UNDER STATE LAW

The branch's primary claim on appeal is that the trial court incorrectly concluded that the commission may

___

[5] Section 46a-86 (c) provides the remedies for violations of, among other laws, § 46a-58, the general antidiscrimination statute. At all relevant times, § 46a-86 (c) allowed for the recovery of economic damages and attorney's fees. By contrast, prior to its 2019 amendment, § 46a-86 (b), which contains the remedies for violations of the employment discrimination statute, § 46a-60, did not allow for the recovery of economic damages or attorney's fees. See Public Acts 2019, No. 19-16, § 7.

[6] The complainant has not participated in the present appeal.

[7] When an appeal is transferred from the Appellate Court to this court, it often will be advisable for the parties to seek permission to revise their briefs accordingly. This approach may be beneficial, for example, when the ongoing vitality of one of our decisions is in question, insofar as the Appellate Court lacks the authority to overrule or modify this court's precedents. See, e.g., *Conway* v. *Wilton*, 238 Conn. 653, 657, 680 A.2d 242 (1996).

In the present case, for example, the commission questioned the ongoing vitality of *Truelove* in its briefing to the Appellate Court but did not directly argue that *Truelove* should be overruled, presumably because that court lacks the authority to do so. Following transfer of the appeals and oral argument, we ordered the parties to submit supplemental briefs to address directly the question of whether *Truelove* was correctly decided. See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014). As we explain subsequently in this opinion, we have determined that the holding in *Truelove* does not

award emotional distress damages and attorney's fees in an employment discrimination action under § 46a-58 (a) and that statute's civil remedies provision, § 46a-86 (c). The branch agrees with the conclusion of the trial court that, under this court's decision in *Truelove*, the commission may adjudicate state law employment discrimination claims only under the auspices of § 46a-60 (which specifically prohibits employment discrimination) and not under § 46a-58 (a) (which prohibits discrimination more broadly). See *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 346. The branch contends, however, that the trial court incorrectly concluded that, to the extent that violations of § 46a-60 also run afoul of Title VII, the commission has the authority to address such violations of federal law as a factual predicate of a § 46a-58 (a) claim. The branch's position is that, under federal law, a state administrative agency such as the commission can assist the federal Equal Employment Opportunity Commission (EEOC) in *investigating* a Title VII employment discrimination claim, but only a court ultimately can resolve the claim on the merits and award damages and attorney's fees. We are not persuaded.

A

Whether the commission has the authority to identify violations of Title VII and to award damages for those violations under state law presents a legal question that we review de novo. See id., 345. To the extent that the issue requires us to interpret the commission's enabling statutes and the state antidiscrimination laws that the commission is responsible for enforcing, we accord deference to the agency's formally articulated interpretation of those statutes when that interpretation is both

control the outcome in the present case, and we therefore have no need to consider whether it should be overruled. See part I B 2 of this opinion.

Connecticut Judicial Branch *v.* Gilbert

time-tested and reasonable. See, e.g., *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 166, 931 A.2d 890 (2007). To the extent that the question requires us to interpret Title VII, some deference is likewise owed to the EEOC's reasonable interpretations of the federal law. See, e.g., *Equal Employment Opportunity Commission* v. *Commercial Office Products Co.*, 486 U.S. 107, 115, 108 S. Ct. 1666, 100 L. Ed. 2d 96 (1988) ("[I]t is axiomatic that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards. Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference.").

Our analysis begins with the plain language of the state statutes. See General Statutes § 1-2z. We agree with the trial court that the statutory text unambiguously permits the commission to identify violations of Title VII and to award damages and attorney's fees for those violations. General Statutes (Supp. 2012) § 46a-58 (a) provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of *any rights*, privileges or immunities, secured or protected by the Constitution or laws of this state *or of the United States*, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness or physical disability." (Emphasis added.) As this court previously has observed, the statute paints in broad, inclusive language, without any apparent exceptions. See *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 711–12, 855 A.2d 212 (2004). Both this court and the legislature consistently have recognized that § 46a-58 (a), which first was enacted in 1884 in the wake of the Reconstruction era federal

Connecticut Judicial Branch *v.* Gilbert

civil rights acts,[8] albeit initially only as a penal statute,[9] was the state's original and fundamental civil rights law. See id., 711–13. It is a remedial statute; id., 707; "with a purpose to cast a broad net of protection for all persons from discrimination"; id., 711–12; and its scope of protection consistently has been expanded by the legislature for more than 100 years. See id., 694, 708. There is no reason, then, to think that § 46a-58 (a) does not sweep violations of Title VII within its broad ambit.

It is equally clear that the legislature has conferred on the commission the authority to identify violations of federal civil rights laws, such as Title VII, as a predicate to finding a violation of § 46a-58 (a). In 1975, the legislature made clear that the commission had authority not only to investigate complaints of such violations but also to resolve civil claims brought under the predecessor to § 46a-58 (a). See Public Acts 1975, No. 75-462. Under the scheme as presently codified, General Statutes § 46a-51 (8) defines "discriminatory practices" under the jurisdiction of the commission to include, among other things, violations of § 46a-58; General Statutes § 46a-56 (a) (3) requires that the commission, among its other duties, "[i]nvestigate and proceed in all cases of discriminatory practices"; and General Statutes § 46a-84 (b) authorizes the commission to hold public contested hearings to resolve on the merits civil com-

---

[8] See Public Acts 1884, c. 86; see also F. Johnson, The Development of State Legislation Concerning the Free Negro (1919) pp. 27–28, 31 (indicating that chapter 86 of 1884 Public Acts was "a measure of general application" modeled on fourteenth amendment and federal Civil Rights Act of 1866, which "covered the whole field [of civil law] by broad enactment").

[9] Section 46a-58 (a), in its original form, did not precisely mirror the text of any of the federal statutes, criminal or civil, but was similarly aimed at the deprivation of legally protected rights on the basis of race or color. In 1949, our legislature supplemented the penal statute with a separate mechanism for civil enforcement, authorizing a person aggrieved by a violation thereof to file a complaint with the commission's predecessor, the civil rights commission. See General Statutes (1955 Supp.) § 3268d.

Connecticut Judicial Branch *v.* Gilbert

plaints of discriminatory practices. Perhaps most significant, the commission's presiding officer is charged with making a finding that the discriminatory practice alleged has occurred and with supporting that determination by written findings of fact. See General Statutes § 46a-86 (a).

Finally, with regard to remedies, General Statutes (Supp. 2012) § 46a-86 (c) provides in relevant part that, "[i]n addition to any other action taken under this section, upon a finding of a discriminatory practice prohibited by section 46a-58 . . . the presiding officer shall determine the damage suffered by the complainant . . . as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs. . . ." The statutory scheme, then, plainly envisions that the commission is competent to determine whether federal antidiscrimination laws, such as Title VII, that come within the scope of § 46a-58 (a) have been violated and is authorized to award damages and attorney's fees for those violations under § 46a-86 (c).

Nor is there any question that a violation of Title VII as a factual predicate of a § 46a-58 (a) violation was established in the present case. In addition to violations of Connecticut's employment discrimination statute, § 46a-60, the complainant alleged in her complaint that the branch discriminated against her on the basis of sex and subjected her to an ongoing hostile work environment, in violation of "Title VII of the Civil Rights Act of 1964 . . . as amended and enforced under [§] 46a-58 (a) . . . ." Relying on *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities*, 170 Conn. 327, 331, 365 A.2d 1210 (1976), and its progeny, the referee treated federal and state antidiscrimination law as largely "coextensive,"[10] and she proceeded on

---

[10] Although the referee observed in passing that § 46a-60 is "undoubtedly more expansive than Title VII"; (internal quotation marks omitted); her citation to *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 693, 41 A.3d 1013 (2012), for that proposition indicates that she understood the state law to afford broader protection only with respect to which classes are protected.

Connecticut Judicial Branch *v.* Gilbert

the premise that federal law informs our interpretation of our own antidiscrimination statutes. The referee found that, under a straightforward reading of both state and federal substantive fair employment law, the branch had discriminated against the complainant by (1) permitting Marco to subject the complainant to severe and pervasive sexual harassment, (2) ignoring other employees' previous complaints of similar behavior by Marco, (3) failing to adequately investigate the complainant's allegations, and (4) altering the conditions of her workplace by transferring her to a less desirable location in response to her complaints. The referee concluded that, from an objective standpoint, the complainant's working conditions were intolerable. Importantly, the branch does not contest these findings on appeal. Nor does the branch deny that its conduct was in violation of Title VII or contend that the referee misapplied the substantive components of the federal law.[11]

B

What the branch does contend is, first, that the commission exceeded its authority under federal law by "adjudicating" a Title VII claim, i.e., holding a formal hearing to determine whether the branch engaged in discriminatory practices, in violation of Title VII, and, second, that the commission ran afoul of *Truelove* by awarding damages and attorney's fees for employment discrimination under § 46a-58 (a) that were not available for violations of § 46a-60. We consider each argument in turn.

1

The branch makes three interrelated arguments as to why, in its view, the commission has exceeded its

For example, § 46a-60 also protects individuals from discrimination on account of age, marital status, ancestry, or disability. See id.

[11] We will address the branch's argument that the referee exceeded her authority under the procedural provisions of Title VII in part I B of this opinion.

Connecticut Judicial Branch *v.* Gilbert

authority under federal law. First, the branch contends that 42 U.S.C. § 2000e-5 (f), the federal statute that allows for the bringing of a judicial action to enforce Title VII, authorizes only courts to find a Title VII violation and to award damages for such violations. Second, the branch notes that the EEOC itself lacks such authority and contends that Congress would not have conferred authority on state administrative agencies that it opted not to confer on the federal agency charged with enforcing Title VII. Third, the branch argues that allowing the commission to award damages for Title VII violations would upset a carefully calibrated federal scheme and deny respondents such as the branch important procedural protections, such as the rights to a jury trial and to remove actions to federal court. We consider each argument in turn.

The branch's statutory argument relies on 42 U.S.C. § 2000e-5 (f),[12] which provides in relevant part that the EEOC "may bring a civil action" alleging a Title VII violation and that "[e]ach United States district court . . . shall have jurisdiction of actions brought under

_____

[12] Section 2000e-5 (f), title 42, of the 2018 edition of the United States Code provides in relevant part: "(1) If within thirty days after a charge is filed with the [Equal Employment Opportunity] Commission . . . the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. . . . Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings . . . .

\* \* \*

"(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. . . ."

Connecticut Judicial Branch *v.* Gilbert

this subchapter. . . .'' The branch contends that the statute confers jurisdiction exclusively on courts, and thus not administrative agencies, to formally resolve Title VII claims. The argument is without merit.

To begin with, the branch relies on a non sequitur insofar as the commission has never purported to adjudicate Title VII claims under the authority of 42 U.S.C. § 2000e-5 (f). That statute, after all, does nothing more than confer jurisdiction on the federal courts to hear Title VII cases and to award the statutory remedies authorized under 42 U.S.C. § 2000e-5 (g). Neither it nor any other federal statute or regulation prevents a state from enacting legislation, such as § 46a-58 (a), that deems a violation of Title VII to be a violation of *state* antidiscrimination law, or from attaching remedial consequences to such a violation, or conferring authority on a state agency to decide such claims in the first instance and to issue corresponding remedies. In fact, Title VII contains a savings clause providing that the federal act does *not* preempt state antidiscrimination law. See 42 U.S.C. § 2000e-7 (2018) (''[n]othing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter'').

The United States Supreme Court has already rejected the argument that the authority to resolve alleged Title VII violations is limited by the conferral of jurisdiction in 42 U.S.C. § 2000e-5 (f) to federal district courts. Although the branch focuses on the fact that the statute authorizes the filing of a civil action in a court, the language in § 2000e-5 (f) expressly confers authority over Title VII claims only on *federal* district

courts. If the statutory conferral of authority were exclusive, as the branch contends, then only federal courts would have jurisdiction over Title VII claims. But that very argument was rejected in *Yellow Freight System, Inc.* v. *Donnelly*, 494 U.S. 820, 110 S. Ct. 1566, 108 L. Ed. 2d 834 (1990), which held that state courts have concurrent jurisdiction over Title VII claims, notwithstanding the lack of any express statutory authorization in § 2000e-5 (f). See id., 823; cf. *Kremer* v. *Chemical Construction Corp.*, 456 U.S. 461, 477, 102 S. Ct. 1883, 72 L. Ed. 2d 262 (1982) ("our statement . . . that final responsibility for enforcement of Title VII is vested with federal courts . . . should not be read to imply, that by vesting final responsibility in one forum, Congress intended to deny finality to decisions in another" (citation omitted; footnote omitted; internal quotation marks omitted). The branch's statutory argument is, therefore, unavailing, particularly in light of the fact that the commission does not purport to formally adjudicate Title VII claims but merely to identify discriminatory practices under Title VII for purposes of applying state law.

The branch's second argument focuses on the fact that the EEOC itself lacks the authority to hold contested hearings to adjudicate Title VII claims and to award damages and attorney's fees for violations thereof. Although the federal agency can investigate such claims and attempt to mediate settlements between the parties, when such informal efforts fail, formal resolution can be obtained only by adjudication in federal or state court. See 42 U.S.C. § 2000e-5 (f) (2018); *Fort Bend* v. *Davis*, U.S. , 139 S. Ct. 1843, 1846–47, 204 L. Ed. 2d 116 (2019); *Yellow Freight System, Inc.* v. *Donnelly*, supra, 494 U.S. 823. It would be anomalous, the branch posits, for Congress to have denied the EEOC the authority to formally resolve Title VII claims only to allow its state counterparts to, in effect, carry out that same function.

Connecticut Judicial Branch *v.* Gilbert

Again, the branch misses the mark. The foregoing discussion demonstrates that the absence of EEOC authority to formally adjudicate Title VII claims does not indicate an intention to bar *state* agencies from identifying Title VII violations for purposes of determining whether *state* law has been violated. Indeed, Congress has expressed a strong preference for resolving matters that concurrently violate Title VII and state employment discrimination laws at the state level, with recourse to federal court provided as a supplemental rather than a preferred venue. As the United States Supreme Court explained in *New York Gaslight Club, Inc.* v. *Carey*, 447 U.S. 54, 100 S. Ct. 2024, 64 L. Ed. 2d 723 (1980), "throughout Title VII the word 'proceeding' . . . is used to refer to all the different types of proceedings in which the statute is enforced, state and federal, administrative and judicial." Id., 62–63. "Initial resort to state and local remedies is mandated, and recourse to the federal forums is appropriate only when the [s]tate does not provide prompt or complete relief." Id., 65. "Title VII explicitly leaves the [s]tates free, and indeed encourages them, to exercise their regulatory power over discriminatory employment practices. Title VII merely provides a supplemental right to sue in federal court if satisfactory relief is not obtained in state forums." Id., 67.

This sentiment pervades the legislative history of Title VII. During the legislative debates, both supporters and opponents of Title VII repeatedly expressed the view that the proposed legislation was predicated on the assumption that the nearly thirty states with functional fair employment practices laws and agencies (primarily northern and western states) generally could be relied on to enforce antidiscrimination law in those locations, and that the new federal agency, the EEOC, would focus its efforts and limited resources on enforcing the law in the states of the old Confederacy, which

Connecticut Judicial Branch *v.* Gilbert

had not seen fit to create their own fair employment practices agencies.[13] The primary sponsors of the legislation made numerous statements indicating their strong preference for resolving discrimination claims at the state level and emphasizing the central role that they envisioned state fair employment practices agencies would play in the enforcement of the federal law.[14] The branch is therefore incorrect when it posits that there is no reason why Congress would permit state administrative agencies, but not the EEOC, to resolve claims based on violations of Title VII. During the debates over Title VII in 1964, and again with respect to the 1972 amendments, the primary argument levied against giving the EEOC the power to hold contested hearings and to issue cease and desist orders was that the states were competent to enforce antidiscrimination law and did not want or need matters resolved by a federal bureaucracy.

The congressional preference for resolving employment discrimination claims at the state level, using state remedies and state administrative agencies, is reflected in Title VII's "work sharing" scheme.[15] Under the work

[13] See, e.g., 110 Cong. Rec. 7205 (1964), remarks of Senator Joseph S. Clark; J. Clark & C. Case, Interpretative Memorandum of Title VII of H.R. 7152, 110 Cong. Rec. 7214 (1964); J. Clark, Response to Dirksen Memorandum, 110 Cong. Rec. 7216 (1964); 110 Cong. Rec. 11,942 (1964), remarks of Senator Richard B. Russell.

[14] See, e.g., 110 Cong. Rec. 7205 (1964), remarks of Senator Joseph S. Clark ("the [EEOC] can make arrangements to use and pay for the services of [s]tate and local agencies in carrying out its duties under the [f]ederal law"); id., 11,936, remarks of Senator Hubert H. Humphrey ("one of the improvements I see in the amendment . . . is the inclusion . . . of provision for the responsibility of local and [s]tate authorities to seek compliance with the law . . . through local enforcement"); id., 12,580, remarks of Senator Humphrey ("we have taken [T]itle VII and rewritten it, believing that the prime responsibility for action and enforcement is at the [s]tate and local level"); id., 12,721, remarks of Senator Humphrey ("[i]n effect, these [work sharing] agreements would give jurisdiction over complaints to [state fair employment practices] agencies [when]ever the practice complained of also violates [s]tate or local law").

[15] The relationship between the EEOC and the state agencies with which it partners and to which it often defers is embodied in numerous provisions

Connecticut Judicial Branch *v.* Gilbert

of Title VII. See, e.g., 42 U.S.C. § 2000e-4 (g) (1) (2018) ("[t]he Commission shall have power . . . to cooperate with and, with their consent, utilize regional, State, local, and other agencies, both public and private, and individuals"); 42 U.S.C. § 2000e-5 (b) (2018) ("[i]n determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d)"); 42 U.S.C. § 2000e-5 (c) (2018) ("[i]n the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law"); 42 U.S.C. § 2000e-5 (d) (2018) ("[i]n the case of any charge filed by a member of the Commission alleging an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days (provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged"); 42 U.S.C. § 2000e-8 (b) (2018) ("The Commission may cooperate with State and local agencies charged with the administration of State fair employment practices laws and, with the consent of such agencies, may, for the purpose of carrying out its functions and duties under this subchapter and within the limitation of funds appropriated specifically for such purpose, engage in and contribute to the cost of research and other projects of mutual interest undertaken by such agencies, and utilize the services of such agencies and their employees, and, notwithstanding any other provision of law, pay by advance or reimbursement such agencies and their employees for services rendered to assist the Commission in carrying out this subchapter. In furtherance of such cooperative efforts, the Commission may enter into written agreements with such State or local agencies and such agreements may include provisions under which the Commission shall refrain from processing a charge in any cases or class of cases specified in such agreements or under which the Commission shall relieve any person or class of persons in such State or locality from requirements imposed under this section."); 42 U.S.C. § 2000e-8 (d) (2018) ("[i]n prescribing requirements pursuant to subsection (c) of this section, the Commission shall consult with other interested State and Federal agencies and shall endeavor to coordinate its

112 APRIL, 2022 343 Conn. 90

Connecticut Judicial Branch *v.* Gilbert

sharing framework, the EEOC and state fair employment practices agencies such as the commission essentially exercise joint jurisdiction over employment discrimination claims filed in either venue, with the EEOC deferring action on many Title VII claims to give state agencies a first crack at resolving them. See United States Equal Employment Opportunity Commission, FY 2012 EEOC/FEPA Model Worksharing Agreement, available at https://www.eeoc.gov/fy-2012-eeocfepa-model-worksharing-agreement (last visited April 20, 2022). As the United States Court of Appeals for the Fourth Circuit has explained, "[t]he jurisdiction of [state fair employment practices] agencies overlaps that of the EEOC." *Equal Employment Opportunity Commission* v. *Navy Federal Credit Union*, 424 F.3d 397, 410 n.15 (4th Cir. 2005), cert. denied, 547 U.S. 1041, 126 S. Ct. 1629, 164 L. Ed. 2d 335 (2006). "[Title VII is] best understood as creating a system of 'cooperative federalism,' under which, in the interests of comity, the EEOC and state and local authorities share primary responsibility to enforce the civil rights laws." Id., 410.

The branch might have a better argument if federal courts had exclusive authority to adjudicate Title VII claims. But, in light of (1) the cooperative work sharing framework created under the federal mandate, (2) Congress' express preference for resolving concurrent state and federal employment discrimination claims at the state level, and (3) "the humanitarian remedial policies" that underlie Title VII; *New York Gaslight Club, Inc.* v. *Carey*, supra, 447 U.S. 62; we are not persuaded by the branch's claim that the commission infringes on principles of federal supremacy by predicating a violation of § 46a-58 (a) on a violation of Title VII. See *Equal Employment Opportunity Commission* v. *Federal Express Corp.*, 268 F. Supp. 2d 192, 198 (E.D.N.Y. 2003) (observ-

requirements with those adopted by such agencies"); see also 29 C.F.R. § 1601.13 (2020).

Connecticut Judicial Branch *v.* Gilbert

ing that courts have liberally interpreted Title VII's standing provisions to effectuate remedial purpose of law); Section-By-Section Analysis of H.R. 1746, The Equal Employment Opportunity Act of 1972, 118 Cong. Rec. 7166, 7168 (1972) ("the individual's rights to redress are paramount under the provisions of Title VII").

The branch's third argument is that litigation of a Title VII claim in a court affords the defendant/respondent various procedural protections—the rights to a jury trial, to remove an action from state court to federal court, to full civil discovery and formal rules of evidence—that are not available in an administrative adjudication. The branch contends that allowing a state fair employment practices agency such as the commission to find and penalize Title VII violations under state law would upset a carefully calibrated federal scheme that balances the availability of remedies with important procedural protections.

The United States Court of Appeals for the Second Circuit has rejected this very argument, finding no violation of federal law despite the contention that allowing a complainant to bring a Title VII claim before the commission, pursuant to § 46a-58 (a), would circumvent federal procedural protections. See *Shelton* v. *Hughes*, 578 Fed. Appx. 53, 55 (2d Cir. 2014). The branch's claim also runs headlong into the United States Supreme Court decisions holding that a state agency's adjudication of an employment discrimination claim, which has been reviewed and affirmed by the state's appellate courts, affords sufficient procedural protections to have preclusive effect with respect to a subsequent action in federal court addressing the same alleged conduct. See, e.g., *Kremer* v. *Chemical Construction Corp.*, supra, 456 U.S. 484 (concluding that "[the] panoply of procedures [provided by the New York State Division of Human Rights hearing], complemented by administrative as well as judicial review," was more than sufficient

Connecticut Judicial Branch *v.* Gilbert

to satisfy demands of due process); *New York Gaslight Club, Inc.* v. *Carey*, supra, 447 U.S. 67–68 (applying rule with respect to prevailing complainant who sought attorney's fees in supplemental federal action); cf. *Nestor* v. *Pratt & Whitney*, 466 F.3d 65, 68, 73 (2d Cir. 2006) (holding that complainant, who prevailed before commission and whose award of back pay was upheld by Connecticut Appellate Court, could seek additional damages and attorney's fees in federal court action when commission's findings as to liability would have preclusive effect, despite administrative forum's use of flexible evidentiary rules and lack of discovery).

Indeed, both of the federal courts that have considered the question before us have concluded that, when the commission finds a Title VII violation as the factual predicate to a violation of § 46a-58 (a), it does so as a matter of Connecticut state law and does not thereby infringe federal supremacy. See *Shelton* v. *Hughes*, supra, 578 Fed. Appx. 54 ("[b]ecause § 46a-58 (a) explicitly adopts federal antidiscrimination law as part of the substantive conduct it regulates, claimants may allege violations of federal law, such as Title VII . . . in actions before the [commission]"); *Shelton* v. *Collins*, Docket No. 3:12cv1176 (JBA), 2014 WL 1032765, *5 (D. Conn. March 14, 2014) (concluding that "no ongoing violation of federal law is plausibly alleged" by statutory scheme that allows award of damages for Title VII violations under §§ 46a-58 (a) and 46a-86 (c)), aff'd sub nom. *Shelton* v. *Hughes*, 578 Fed. Appx. 53 (2d Cir. 2014); see also *Carey* v. *New York Gaslight Club, Inc.*, 598 F.2d 1253, 1257–58 (2d Cir. 1979) (holding that provision of Title VII providing attorney's fees for prevailing parties extended to complainant whose EEOC complaint was referred to and resolved in public hearing before New York State Division of Human Rights, and opining that "[the reasoning of other United States Courts of Appeals] supports a similarly favorable result for com-

343 Conn. 90 APRIL, 2022 115

Connecticut Judicial Branch *v.* Gilbert

plainants who succeed in state administrative proceedings pursuant to Title VII''), aff'd, 447 U.S. 54, 100 S. Ct. 2024, 64 L. Ed. 2d 723 (1980).[16] We find the rationales underlying these decisions to be persuasive.[17]

---

[16] We note that there is limited, but conflicting, authority on the question of whether state agencies may adjudicate a Title VII claim purely as a matter of *federal* law. Compare *Patzer* v. *Board of Regents*, 763 F.2d 851, 857 and n.7 (7th Cir. 1985) (holding that state agency lacks authority), with *Employment Security Commission* v. *Peace*, 128 N.C. App. 1, 7–9, 493 S.E.2d 466 (1997) (holding that North Carolina State Personnel Commission had authority to adjudicate merits of Title VII claim), aff'd in part and dismissed in part, 349 N.C. 315, 507 S.E.2d 272 (1998). As we emphasized, that question differs from the one we answer in the present case.

[17] We also note that, since 2006, the commission has adjudicated numerous claims of employment discrimination, jointly docketed with the EEOC, in which the commission has purported to find violations of Title VII and to award emotional distress damages for those violations under the auspices of §§ 46a-58 (a) and 46a-86 (c). See, e.g., *Commission on Human Rights & Opportunities ex rel. Taranto* v. *Big Enough, Inc.*, Docket No. 0420316, 2006 WL 4753475, *11 (C.H.R.O. June 30, 2006). Various oversight procedures governing the relationship between the EEOC and the commission, particularly with respect to jointly docketed cases such as these, would have provided opportunities for the EEOC to become aware of the commission's long-standing practice of making determinations whether a violation of Title VII occurred and, in some cases, awarding damages for such violations under state law. The EEOC has certified the commission as a designated fair employment practices agency; 29 C.F.R. § 1601.80 (2020); which permits the EEOC to accept the commission's findings and resolutions of many jointly filed cases without conducting an individual, case-by-case, substantial weight review. 29 C.F.R. § 1601.75 (a) (2020). But see 29 C.F.R. §§1601.76 and 1601.77 (2020) (providing exceptions when review is undertaken). After certification, the EEOC continues to monitor and evaluate the work of designated fair employment practices agencies. 29 C.F.R. § 1601.78 (2020). In addition, federal regulations require that, for cases processed under contract with the EEOC, the EEOC ''shall review charges closed by the certified [fair employment practices] agency for lack of jurisdiction . . . .'' 29 C.F.R. § 1601.77 (2020). The EEOC may revoke the certification of an agency that, following such an evaluation, is deemed to no longer serve the interest of effective enforcement of Title VII. 29 C.F.R. § 1601.79 (2020). In addition, the work sharing agreement provides for the regular exchange of case information between the two agencies. See United States Equal Employment Opportunity Commission, FY 2012 EEOC/FEPA Model Worksharing Agreement: Worksharing Agreement Between State of Connecticut Commission on Human Rights and Opportunities and the U.S. Equal Employment Opportunity Commission New York District Office for Fiscal Year 2012, available

Connecticut Judicial Branch *v.* Gilbert

2

The branch also argues that, even if federal law does not bar the commission from awarding damages for Title VII violations under §§ 46a-58 (a) and 46a-86 (c), the commission is precluded from doing so under state law, as construed by *Truelove.* In *Truelove,* this court held that state law employment discrimination claims can be brought only under § 46a-60, the statute specifically dedicated to such claims, and not under § 46a-58 (a), the general antidiscrimination statute. See *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.,* supra, 238 Conn. 346. The court applied the canon of construction that "specific terms covering the given subject matter will prevail over general language of the same or another statute [that] might otherwise prove controlling"; (internal quotation marks omitted) id.; and also posited that there would have been no reason for the legislature to authorize different remedies for violations of the two statutes if employment discrimination claims could be brought under either. See id., 347. The branch contends that the same reasoning applies to Title VII claims; it would have been incongruous for the legislature to require that state law employment discrimination claims be brought under § 46a-60 and limited to the equitable remedies that were then available under § 46a-86 (b) but, at the same time, to allow the commission to determine that the same discriminatory practices offended Title VII and to award damages and attorney's fees on that basis, via §§ 46a-58 (a) and 46a-86 (c).

at https://www.eeoc.gov/fy-2012-eeocfepa-model-worksharing-agreement-worksharing-agreement-between-state-connecticut (last visited April 20, 2022). Accordingly, although we cannot say with certainty that the EEOC has in fact reviewed either the commission's decision in the present case or any other particular cases in which the commission has awarded damages under §§ 46a-58 (a) and 46a-86 (c) after finding a Title VII violation, we take the EEOC's ongoing oversight role as an indication that the commission's practices in this regard are considered proper.

343 Conn. 90 APRIL, 2022 117

Connecticut Judicial Branch *v.* Gilbert

We again are unpersuaded. Nothing in *Truelove* indicates that the legislature intended to preclude the commission from awarding a remedy authorized by § 46a-86 (c) for a violation of § 46a-58 (a) predicated on a discriminatory practice prohibited by federal law. Because the plaintiff in *Truelove* asserted no Title VII claim under § 46a-58 (a), the court had no occasion to consider the relief available in the present circumstances, which involve a violation of § 46a-58 (a) predicated on federal law. The decision in *Truelove* rested on our conclusion that the legislature, by attaching different remedies to our state's various antidiscrimination statutes, had demonstrated an intention to limit the remedies available for a violation of § 46a-60. But violations of federal antidiscrimination law were cognizable under § 46a-58 (a), which carried (and continues to carry) its own unique remedies, long before the adoption of the Connecticut Fair Employment Practices Act. Our holding in *Truelove* cannot be understood to authorize this court to ignore the explicit terms of General Statutes (2012 Supp.) § 46a-58 (a), which provides in relevant part that "[i]t shall be a discriminatory practice in violation of this section" to deprive any person of rights "protected by the . . . laws of . . . the United States, on account of . . . sex . . . ."

Two events occurring since *Truelove* was decided counsel against any expansion of the breadth of its holding. First, although the court in *Truelove* stated that the relevant legislative history shed no light on the intended interrelationship between §§ 46a-58 and 46a-60; *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 346 n.13; doubt was later cast on that observation by our decision in *Commission on Human Rights & Opportunities* v. *Board of Education*, supra, 270 Conn. 690–705, which chronicled the extensive legislative history and deemed it to be incompatible with a "cramped interpretation"

Connecticut Judicial Branch *v.* Gilbert

of the statutory scheme. Id., 703. Second, the legislature in effect overruled *Truelove* in 2019 by making economic damages and attorney's fees available to a party who prevails on a state law claim of employment discrimination under § 46a-60. See Public Acts 2019, No. 19-16, § 7. Accordingly, although principles of stare decisis counsel against reconsidering *Truelove* at this time, we will not now extend the reasoning of that decision beyond its narrow confines.[18] The legislative scheme may not create the most elegant framework for assigning different remedies to different discriminatory practices on the basis of the jurisdictional source of the injury, but the result we reach is dictated by the sweeping language of §§ 46a-58 (a) and 46a-86 (c).[19]

[18] We find no merit in the branch's argument that, if we determine that § 46a-58 (a) is ambiguous, then, rather than consult extrinsic sources of information, we must simply interpret it in the manner that exposes the branch to the least potential liability because waivers of the state's sovereign immunity must be narrowly construed. As we explain more fully in part II of this opinion, we agree that statutes by which the state purportedly waives its sovereign immunity must be narrowly construed. But § 46a-58 (a) is not a waiver of sovereign immunity; it is a general prohibition against discrimination by public and private parties alike. The branch has not offered and we are not aware of any authority for the proposition that, when a statute of general applicability is found to be ambiguous, it must be construed narrowly so that, when the state happens to be the defendant, the state's liability will be limited. Indeed, the United States Supreme Court repeatedly has instructed otherwise. See, e.g., *Gomez-Perez* v. *Potter*, 553 U.S. 474, 491, 128 S. Ct. 1931, 170 L. Ed. 2d 887 (2008) ("[when] one statutory provision unequivocally provides for a waiver of sovereign immunity to enforce a separate statutory provision, that latter provision need not . . . be construed in the manner appropriate to waivers of sovereign immunity" (internal quotation marks omitted)); see also *Richlin Security Service Co.* v. *Chertoff*, 553 U.S. 571, 589, 128 S. Ct. 2007, 170 L. Ed. 2d 960 (2008) ("The sovereign immunity canon is just that—a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other traditional tools of statutory construction.").

[19] With respect to the question of whether the various statutes under the commission's jurisdiction collectively operate so as to preclude the award of damages for violations of federal employment discrimination law, we further note that the commission has been deciding Title VII claims in partnership with the EEOC under § 46a-58 (a), and awarding damages for violations under § 46a-86 (c), for many years. See, e.g., *Shelton* v. *Collins*,

343 Conn. 90 APRIL, 2022 119

Connecticut Judicial Branch *v.* Gilbert

Accordingly, we affirm the judgment of the trial court with respect to the Title VII issue.

II

PREJUDGMENT AND POSTJUDGMENT INTEREST— SOVERIEGN IMMUNITY

We next consider whether the trial court properly concluded that the state has waived its sovereign immunity with respect to prejudgment and postjudgment interest on awards under § 46a-86. The commission contends that, by waiving immunity to suit and to liability under § 46a-51 (10), which provides in relevant part

supra, 2014 WL 1032765, *3 n.5, *4 n.8 (citing Connecticut cases). The appendix to the commission's trial brief contains more than 70 decisions, dating back to 1999, in which the commission resolved Title VII claims under the auspices of § 46a-58 (a). The commission is not alone in this regard. See *Employment Security Commission* v. *Peace*, 128 N.C. App. 1, 7–9, 493 S.E.2d 466 (1997) (North Carolina State Personnel Commission adjudicated Title VII claim), aff'd in part and dismissed in part, 349 N.C. 315, 507 S.E.2d 272 (1998); see also *Carey* v. *New York Gaslight Club, Inc.*, supra, 598 F.2d 1257–58 (New York State Division of Human Rights resolved "Title VII claim" in contested hearing "pursuant to Title VII"). The commission also is not the only state agency to be authorized under Connecticut law to identify violations of federal statutes and to impose remedies for those violations under state law. See, e.g., General Statutes § 36a-606a (money laundering); General Statutes § 36a-719f (mortgage loan servicing); General Statutes § 36a-812 (debt collection); General Statutes § 36a-853 (student loan servicing).

As early as 2006, following the decision of this court in *Commission on Human Rights & Opportunities* v. *Board of Education*, supra, 270 Conn. 665, the commission formally took the position that a "complainant's inclusion of . . . § 46a-58 (a) in her complaint affidavit allows [the commission] to convert her federal claims into claims under Connecticut's antidiscrimination laws, and to award damages for emotional distress pursuant to . . . § 46a-86 (c)." *Commission on Human Rights & Opportunities ex rel. DiMicco* v. *Neil Roberts, Inc.*, No. 0420438, 2006 WL 4753465, *4 (C.H.R.O. September 12, 2006). As we discussed, reasonable, long-standing, formally articulated interpretations of a statute by an administrative agency are entitled to deference. Although the branch contends that the commission's interpretation is not time-tested and, thus, not entitled to deference, the branch fails to explain why a string of decisions going back more than fifteen years does not satisfy that standard.

Connecticut Judicial Branch *v.* Gilbert

that the term " '[e]mployer' includes the state and all political subdivisions thereof" for purposes of the Fair Employment Practices Act, the legislature also necessarily waived immunity as to interest. We conclude, to the contrary, that the award of interest is subject to special treatment for purposes of sovereign immunity, and we agree with the branch that the state's waiver of sovereign immunity as to liability for civil rights violations under §§ 46a-58 (a) and 46a-60 and as to back pay and damages under § 46a-86 (b) and (c) does not constitute a waiver of immunity as to interest on such awards.

"Sovereign immunity . . . presents a question of law over which we exercise de novo review. . . . The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. . . . Exceptions to this doctrine are few and narrowly construed under our jurisprudence." (Internal quotation marks omitted.) *Columbia Air Services, Inc.* v. *Dept. of Transportation*, 293 Conn. 342, 349, 977 A.2d 636 (2009).

The federal courts have long applied the so-called "no-interest rule," pursuant to which, in the absence of an express legislative waiver, Congress is presumed not to have waived the federal government's sovereign immunity with respect to prejudgment and postjudgment interest. *Library of Congress* v. *Shaw*, 478 U.S. 310, 311, 106 S. Ct. 2957, 92 L. Ed. 2d 250 (1986). The United States Supreme Court traced the history of and rationale for this rule in *Shaw*: "This requirement of a separate waiver reflects the historical view that interest is an element of damages separate from damages on the substantive claim. . . . Because interest was generally presumed not to be within the contemplation of the parties, common-law courts in England allowed interest by way of damages only when founded [on] agreement of the parties. . . . In turn, the [agreement basis] of

Connecticut Judicial Branch *v.* Gilbert

interest was adopted by American courts. . . . Gradually, in suits between private parties, the necessity of an agreement faded. . . .

"The agreement requirement assumed special force when applied to claims for interest against the United States. As sovereign, the United States, in the absence of its consent, is immune from suit. . . . This basic rule of sovereign immunity, in conjunction with the requirement of an agreement to pay interest, gave rise to the rule that interest cannot be recovered unless the award of interest was affirmatively and separately contemplated by Congress. . . . The purpose of the rule is to permit the [g]overnment to occupy an apparently favored position . . . by protecting it from claims for interest that would prevail against private parties. . . .

"For well over [one] century, this [c]ourt, executive agencies, and Congress itself consistently have recognized that federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates that result. The no-interest rule is expressly described as early as 1819 . . . .

* * *

"[Accordingly,] [i]n analyzing whether Congress has waived the immunity of the United States, we must construe waivers strictly in favor of the sovereign . . . and not enlarge the waiver beyond what the language requires . . . . The no-interest rule provides an added gloss of strictness [on] these usual rules.

"[T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice whe[n] the intent is not translated into affirmative statutory or contractual

Connecticut Judicial Branch *v.* Gilbert

terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.'' (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 314–18.

Applying these principles, the United States Supreme Court in *Shaw* concluded that prejudgment interest could not be awarded for employment discrimination claims under Title VII because, although Congress waived sovereign immunity with respect to liability and damages, it did not specifically and expressly authorize interest payments in the statute.[20] See id., 319, 323. The court rejected the argument that prejudgment interest can be characterized as ''damages,'' a ''penalty,'' or ''just compensation'' so as to avoid the no-interest rule. (Internal quotation marks omitted.) Id., 321; see *Arneson* v. *Callahan*, 128 F.3d 1243, 1247 (8th Cir. 1997) (no-interest rule applies notwithstanding that prejudgment interest awards are necessary to make whole victims of discrimination), cert. denied sub nom. *Arneson* v. *Apfel*, 524 U.S. 926, 118 S. Ct. 2319, 141 L. Ed. 2d 694 (1998).

Although our state courts have not articulated the no-interest rule with the same frequency or specificity as have our federal counterparts, it is apparent that the rule applies with equal force to the state under Connecticut law. In *Struckman* v. *Burns*, 205 Conn. 542, 534 A.2d 888 (1987), this court held that prejudgment interest was not available for a claim brought under the defective highway statute, General Statutes § 13a-144. See id., 543, 556. Although the statute reasonably could have been read to imply that prejudgment interest was available; see id., 557–58; the court applied the

---

[20] We note that Congress subsequently amended Title VII to provide expressly for prejudgment interest awards against the United States. See Civil Rights Act of 1991, Pub. L. No. 102-166, § 114, 105 Stat. 1071. Of course, that option is always available to our state legislature with respect to interest awards against the state.

Connecticut Judicial Branch *v.* Gilbert

principles that "[a]ny statutory waiver of immunity must be narrowly construed" and that "[t]he state's sovereign right not to be sued may be waived by the legislature [only if] clear intention to that effect is disclosed by the use of express terms or by force of a necessary implication." (Internal quotation marks omitted.) Id., 558. Consistent with those principles, the court adopted the majority view that "a statute that generally allows interest awards does not waive a state's sovereign immunity unless there is an express provision to that effect in the statute." Id., 559; see *White Oak Corp.* v. *Dept. of Transportation*, 217 Conn. 281, 298, 585 A.2d 1199 (1991) (concluding that state is immune from award of interest under general interest statute, General Statutes § 37-3a, in absence of express statutory authorization).[21]

We applied these principles again in *Hicks* v. *State*, 297 Conn. 798, 1 A.3d 39 (2010), in which we held that postjudgment interest is not available against the state for damages awards under General Statutes § 52-556, which expressly waives the state's sovereign immunity with regard to damages for injuries caused by motor vehicles operated by state employees and owned and insured by the state. See id., 799–800 and n.2. Relying on *Struckman* and its progeny, we explained that "statutes in derogation of sovereign immunity should be strictly construed. . . . [When] there is *any doubt* about their meaning or intent they are given the effect [that] makes the least rather than the most change in sovereign immunity." (Emphasis in original; internal quotation marks omitted.) Id., 802. We also rejected the plaintiff's argument in *Hicks* that postjudgment interest

_____

[21] An example of a statute that contains an express waiver of sovereign immunity with respect to interest is General Statutes § 4-61 (a) which, in the context of discussing interest awards in breach of contract actions against the state in connection with highway and public works contracts, provides in relevant part that "[a]ll legal defenses except governmental immunity shall be reserved to the state. . . ."

Connecticut Judicial Branch *v.* Gilbert

was necessary as a matter of public policy to ensure the orderly payment of judgments. We explained that the doctrine of sovereign immunity embodies and prioritizes a different public policy, namely, the " 'ancient' "; id., 801; and compelling policy of " 'prevent[ing] the imposition of enormous fiscal burdens on states.' " Id., 807.

Accordingly, under *Struckman*, if the legislature has waived the state's sovereign immunity as to interest, it must have done so either expressly or by force of necessary implication. It is clear that the state has not expressly waived its immunity with respect to interest on damages and back pay awarded pursuant to § 46a-86 (b) and (c). Moreover, in *Hicks*, we concluded that, because interest is not traditionally "awarded *as a part of damages*," a statutory waiver of sovereign immunity only as to damages does not, by force of necessary implication, waive the state's immunity as to interest. (Emphasis in original.) Id., 803.

The commission counters that liability for interest *is* inherent in the award of back pay and, therefore, that, by providing for the award of back pay against the state, § 46a-86 (b) necessarily waives sovereign immunity as to interest, as well. The federal courts have rejected this argument. In *Loeffler* v. *Frank*, 486 U.S. 549, 557–58, 108 S. Ct. 1965, 100 L. Ed. 2d 549 (1988), the United States Supreme Court proceeded on the assumption that, although interest is impliedly available on awards of back pay against private employers under Title VII, Congress had not waived the government's sovereign immunity thereunder. In *Brown* v. *Secretary of Army*, 918 F.2d 214, 218 (D.C. Cir. 1990), cert. denied sub nom. *Brown* v. *Stone*, 502 U.S. 810, 112 S. Ct. 57, 116 L. Ed. 2d 33 (1991), the United States Court of Appeals for the District of Columbia Circuit, applying *Loeffler*, concluded that, in the absence of an express waiver, the government's sovereign immunity bars the award of

Connecticut Judicial Branch *v.* Gilbert

interest on Title VII back pay awards. Several other federal courts of appeals have adopted the reasoning of *Shaw* and *Brown* in the Title VII context; see, e.g., *Arneson* v. *Callahan*, supra, 128 F.3d 1245–46; *Woolf* v. *Bowles*, 57 F.3d 407, 409–10 (4th Cir. 1995); *Edwards* v. *Lujan*, 40 F.3d 1152, 1154 (10th Cir. 1994), cert. denied sub nom. *Edwards* v. *Dept. of Interior*, 516 U.S. 963, 116 S. Ct. 417, 133 L. Ed. 2d 335 (1995); or with respect to similar statutes. See, e.g., *Adam* v. *Norton*, 636 F.3d 1190, 1192–93 (9th Cir. 2011); *Ward* v. *Brown*, 22 F.3d 516, 520 (2d Cir. 1994).[22] But see *DeRoche* v. *Massachusetts Commission Against Discrimination*, 447 Mass. 1, 12–14, 848 N.E.2d 1197 (2006) (holding that, by permitting the award of back pay against public employer under commonwealth's antidiscrimination laws, state legislature by necessary implication also waived sovereign immunity as to interest awards).

The commission directs our attention to *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 827 A.2d 659 (2003), the case on which the trial court relied in concluding that the state has waived its sovereign immunity with respect to interest payments under § 46a-86 (a). In *Thames Talent, Ltd.*, this court concluded that the failure to award interest on awards of back pay under § 46a-86 (b) against private employers "would be contrary to the fundamental purpose of our laws against workplace discrimination [as it would] deprive a person victimized by such discrimination of the true value of the money to which he or she lawfully is entitled . . . ." Id., 143. In that case, however, the defendant was a private party,

---

[22] The federal courts are in disagreement as to whether the express congressional waiver of sovereign immunity under a different statute, the Back Pay Act; 5 U.S.C. § 5596 (2018); applies to claims brought under Title VII. Compare, e.g., *Woolf* v. *Bowles*, supra, 57 F.3d 410 (Back Pay Act waives government's sovereign immunity from interest awards in Title VII cases), with *Arneson* v. *Callahan*, supra, 128 F.3d 1246 (Back Pay Act does not govern Title VII).

Connecticut Judicial Branch *v.* Gilbert

and we emphasized that our conclusion was consistent
with the federal courts' interpretation of Title VII. See
id., 143 n.23. The federal courts have indeed applied
this rationale to conclude that the award of interest is
necessary to make complainants whole with respect to
back pay awards against *private* employers, but they
nevertheless have concluded that sovereign immunity
bars the award of interest against public employers in
the absence of an express statutory authorization. This
reasoning reflects the fact that, although Title VII and
its state counterparts are remedial statutes, which gen-
erally must be construed liberally to fully compensate
complainants for their injuries and to discourage defen-
dants from delaying the payment of back wages; see,
e.g., id., 144–45; different rules of construction apply
when the defendant is sovereign, in recognition of the
fundamentally different policy concerns that are at
issue. See, e.g., *Martinez* v. *Dept. of Public Safety*, 263
Conn. 74, 79, 818 A.2d 758 (2003) ("[t]he practical and
logical basis of the doctrine [of sovereign immunity] is
today recognized to rest on this principle [that there
can be no legal right as against the authority that makes
the law on which the right depends] and on the hazard
that the subjection of the state and federal governments
to private litigation might constitute a serious interfer-
ence with the performance of their functions and with
their control over their respective instrumentalities,
funds, and property" (internal quotation marks omit-
ted)); *Ware* v. *State*, 118 Conn. App. 65, 89, 983 A.2d
853 (2009) (holding that waiver of state's sovereign
immunity under Fair Employment Practices Act does
not extend to punitive damages because different policy
considerations apply to state than to private actors);
see also *State* v. *Lombardo Bros. Mason Contractors*,
*Inc.*, 307 Conn. 412, 431–32, 54 A.3d 1005 (2012) (dis-
cussing policy justifications for closely related nullum
tempus rule).[23]

---

[23] The cases from other jurisdictions that the commission cites are likewise
unavailing, insofar as prejudgment and postjudgment interest awards and,

Connecticut Judicial Branch *v.* Gilbert

Consistent with federal law, we conclude that the state has not waived its sovereign immunity with respect to prejudgment and postjudgment interest payable under § 46a-86 (a), either expressly or by necessary implication. Accordingly, we reverse the judgment of the trial court in that regard and conclude that the commission's award of interest must be vacated.

## III

## EMOTIONAL DISTRESS DAMAGES

Having held in part I of this opinion that the commission is authorized to award emotional distress damages in this case, we now must address the first issue in the commission's cross appeal, namely, whether the trial court correctly concluded that the complainant should have been precluded from recovering any emotional distress damages as a sanction for her refusal to produce her full medical and psychotherapy records during discovery.[24] We disagree with the trial court that the referee was required to disallow any evidence of "garden-variety" emotional distress.[25] We do agree with the

thus, the no-interest rule, were not at issue; see, e.g., *Gares* v. *Willingboro*, 90 F.3d 720 (3d Cir. 1996); *Paterson* v. *State*, 128 Idaho 494, 915 P.2d 724 (1996); *Bain* v. *Springfield*, 424 Mass. 758, 678 N.E.2d 155 (1997); or insofar as the issue of sovereign immunity was not before the court. See, e.g., *Clarke* v. *Frank*, 960 F.2d 1146 (2d Cir. 1992).

[24] In addition to the substantive challenges discussed hereinafter, the commission raises other challenges to the trial court's decision to vacate the emotional distress damages award, such as that the branch's claim was inadequately briefed before the trial court and should have been deemed abandoned and that the information sought by the branch was privileged. We have reviewed those claims and find them unavailing.

[25] We note that the referee relied on a recognized distinction in carving out a discrete subset of garden-variety emotional distress that can be proven solely on the basis of the complainant's own and other lay testimony, without the need for expert medical evidence. In *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 41 A.3d 1013 (2012), we recognized that such claims are cognizable under Connecticut law. See id., 707–708. Although no one involved in this litigation has offered a precise definition of the phrase "garden-variety emotional distress," the term appears to have a commonly understood meaning, and, on appeal, the parties have not challenged the referee's use of the term. For purposes of this case, we will use the phrase as the referee appeared

Connecticut Judicial Branch *v.* Gilbert

branch, however, that certain evidence of treatment related emotional distress was improperly admitted. Although it is a close call, we are unable to conclude on this record that the evidentiary error was harmless. We therefore remand the case to the trial court with direction to remand to the commission for a new hearing in damages.

A

The record reveals the following relevant procedural facts. During the administrative proceedings, the branch issued discovery requests to both the complainant and the commission. The branch included the following request: "Please produce all medical records, counseling records, office notes, or other documents, if any, identifying any and all medical professionals who[m] the complainant consulted with or was treated by for emotional damages and/or physical damages that the complainant contends are related to [her] claims of discrimination." No such records were produced in response to this request. The complainant's initial witness lists, however, included two proposed witnesses— Dawn Gurn, a therapist, and Michael E. Coyle, a psychologist—whom the complainant identified as individuals who provided mental health treatment to her. She indicated that she intended to call both of these witnesses in support of her claim for emotional distress damages. The branch objected to the proposed testimony because the complainant had failed to supply any medical or mental health records relating to either witness, despite its request.

The referee ruled on the branch's objections off the record, during a prehearing conference on September

to use it, to describe emotional distress that (1) is testified to only by the complainant and other lay witnesses, (2) involves the sorts of everyday emotional and physical reactions to trauma that a jury reasonably could be expected to assess without the assistance of expert testimony, and (3) does not involve a claim by the complainant that the emotional distress required professional medical/psychological diagnosis, treatment, or medication.

Connecticut Judicial Branch *v.* Gilbert

29, 2014. The precise ruling is unclear. The record contains an e-mail to the parties on that date from Assistant Attorney General Ann E. Lynch, who presumably was serving as counsel to the branch. The e-mail states that "[t]his is to confirm that [the] [r]eferee . . . ordered [the] complainant to provide [the branch's] counsel . . . with a complete copy of . . . Coyle's file no later than October 15, 2014. In the alternative, on or before October 7, 2014, [the complainant] is to provide [the branch's] counsel with a release authorizing [the branch's] counsel to obtain a complete copy of . . . Coyle's file." In its subsequent briefing to the commission, however, the branch repeatedly characterized the referee's September 29 oral ruling differently. In one motion, for instance, the branch states: "On September 29, 2014, during the prehearing conference, [the] [r]eferee . . . ruled that, *if the complainant intended on pursuing anything other than garden-variety emotional distress, she needed to provide copies of her psychological or mental health records.*" (Emphasis added.) The branch thus appears to acknowledge that the referee did not unconditionally order the complainant to disclose her private medical records but, instead, ruled that she would need to do so if she wished to recover anything more than garden-variety emotional distress damages.[26]

In any event, during the two years that passed between the referee's September, 2014 ruling and the November, 2016 hearing, the complainant made various attempts to accommodate the branch's discovery request while preserving her medical privacy. After obtaining an extension of time within which to produce the requested

---

[26] In some instances, but not others, the branch characterized the referee's order as precluding not only medical testimony but also any testimony by the complainant's husband as to her emotional state. Our review of the record did not disclose any independent verification of this contention, and the referee did, in fact, allow the complainant's husband to testify at trial regarding her emotional distress.

Connecticut Judicial Branch *v.* Gilbert

records, the complainant filed what she styled as a motion for a protective order. In that motion, she offered to provide the branch (1) a summary of her unredacted treatment history with Coyle, which would be filed under seal and be reviewable only by the branch's counsel and expert witnesses, and (2) Coyle's full treatment notes, which would be reviewable only by counsel at Coyle's office. The complainant attached to the motion a case summary drafted by Coyle, with certain personal information regarding the complainant redacted.[27] Also attached was a treatment history listing the dates when the complainant saw Coyle and the fees she paid for those office visits.

The branch filed an objection to the motion, contending that the only appropriate remedy for the complainant's alleged discovery noncompliance was to preclude her from pursuing anything other than garden-variety emotional distress damages. The referee sustained the branch's objection.[28]

On several occasions during the hearing, the referee appeared to confirm that she had not unconditionally ordered the complainant to produce the records at issue but merely had ruled that the complainant would have to do so in order to obtain anything more than garden-variety emotional distress damages. In response to the branch's argument that the complainant was not permitted to withhold relevant records, the referee stated:

[27] The redacted information does not appear to be relevant to the complainant's claims, and we perceive nothing in the case summary that would serve to undermine the complainant's claim that she suffered emotional distress as a result of Marco's conduct and the branch's failure to adequately respond to the harassment.

[28] In late 2014, the complainant belatedly provided the branch a release to obtain Coyle's full treatment notes, and, in early 2015, she gave the branch what appeared to be Coyle's original notes. She represented that Coyle had refused her request to supply the notes for "ethical" reasons and, therefore, that she had been forced to obtain them via subpoena. The parties filed additional motions seeking the preclusion or inclusion of the records.

Connecticut Judicial Branch *v.* Gilbert

"No. That was not my ruling. I ruled earlier in this case. I think a couple [of] years ago, I ruled. There will be no evidence of medical bills from doctors without the entire medical records being submitted."[29] The referee later reiterated: "I made a ruling . . . early on in this case that, unless they were providing full medical records, the only damages they would be entitled to would be garden-variety emotional distress damages."

Consistent with these statements, and because the complainant had not produced all of the requested records by the time of the hearing,[30] the referee ruled that the complainant would be allowed to put on evidence in support of her claim for garden-variety emotional distress but could not introduce medical records or other treatment related evidence of emotional distress damages. "[S]o we're clear about the emotional distress," the referee ruled, "any evidence beyond the garden-variety emotional distress claim is precluded unless the full entire medical records are produced."

At the hearing, the branch repeatedly objected to the admission of the complainant's evidence on two grounds. First, in a departure from the stance it took during the prehearing briefing, the branch argued that the complainant should be barred from introducing evidence even of garden-variety emotional distress. It contended that, without access to the complainant's medical records, it could not adequately cross-examine her regarding those claimed damages. The referee overruled those objections, stating that, in her view, the

---

[29] Further clouding the issue is the fact that the commission took an arguably different view of the referee's order and her subsequent actions. Specifically, in its prehearing briefing, the commission seemed to acknowledge that the complainant had violated a direct discovery order and, as a result, had been prohibited from presenting medical evidence.

[30] The complainant's counsel acknowledged that the complainant had not produced her complete medical records. For example, she never produced Gurn's treatment records.

Connecticut Judicial Branch *v.* Gilbert

branch had an adequate opportunity for cross-examination without the records. Accordingly, the complainant was permitted to testify that she felt "dirty," victimized, embarrassed, ashamed, and fearful as a result of Marco's conduct and the branch's inadequate response. She testified that, following the incidents, she had ceased to be a happy person; she suffered anxiety and nervousness, and would wake in the night crying. The complainant was visibly shaking and in tears during this testimony. Her testimony as to the emotional distress that she suffered during and following the Marco incidents was corroborated by the testimony of several other nonmedical witnesses, including her husband, John Gilbert, each of whom the referee found to be credible.

Second, the branch contended that some of the testimony by the complainant and her lay witnesses crossed the threshold from garden-variety to treatment related emotional distress damages because the testimony occasionally alluded to or directly referenced the complainant's use of mental health counselling and pharmaceuticals to treat her emotional distress. The referee's response to this second category of objections was not a model of clarity or consistency. When the branch objected to the complainant's testimony that her physician had prescribed daily Lexapro for depression and anxiety, the referee allowed her to testify as to the medication but not the amount. When the branch objected to testimony that the complainant saw Gurn for therapy, the referee allowed the complainant and her husband to testify that she went to Gurn but not about the "particulars" as to what occurred at the therapist's office. When the branch objected to testimony that the complainant was taking Tylenol PM and prescription sleep aids, the referee responded: "We really can't get into too much medical information, because we're not doing this based on her treatment. . . .

Connecticut Judicial Branch *v.* Gilbert

[L]et's rephrase; just the over-the-counter [medications] that you know of . . . which does not have anything to do with records.'' Finally, when the branch objected to testimony regarding the complainant's use of Xanax, the referee ruled: ''I think we're not getting into physician visits. I outlined in the beginning what garden-variety emotional distress is and how it's analyzed. I really don't think [that] taking a medic[ation] necessitates a review of medical records, but I don't want to get into more treatment or anything that happened with a doctor.

\* \* \*

''I really don't understand [the branch's] objection because . . . I'm not letting in any evidence that pertains to [the complainant's] treatment. I know [that her husband] mentioned a prescription. We can strike that prescription . . . from the record . . . .''[31]

In her memorandum of decision, the referee largely avoids any mention of the complainant's use of medications or counselling services, and, in her analysis explaining her award of emotional distress damages, she makes no mention of that testimony.[32] Her factual findings, however, do include three references to the complainant's use of ''a prescription drug'' or ''medica-

---

[31] The complainant also testified in several instances regarding her need for psychotherapy as a result of the alleged abuse: ''I had already called the [employee assistance program]. . . . And that's when I . . . got my own therapist. . . . I went to a counselor. . . . Gurn. I went to see her and was going to her.'' She continued: ''At that time, I was still very hurt and very confused and even blocked. That's why I went to therapy, to try to unblock my memory to find out who was there.'' She further testified that she ''was still prior to this in a state of shock, which [she] had to go to counseling for, two different counselors . . . .''

[32] The referee's discussion of the serious emotional distress suffered by the complainant focused instead on the intolerable behavior involved, the subjective offensiveness of the abuse, the fact that the harassment took place in public, and the fact that the complainant's supervisors failed to take seriously her repeated complaints.

Connecticut Judicial Branch *v.* Gilbert

tion'' to treat insomnia, anxiety, and chest pains arising from the alleged abuse.

Ultimately, the referee found that the complainant had suffered emotional distress as a result of the branch's discriminatory treatment. After citing case law for the proposition that garden-variety emotional distress claims generally merit $30,000 to $125,000 awards, she awarded the complainant $50,000 in emotional distress damages.

B

On appeal from the referee's decision, the trial court determined that (1) the complainant had failed to provide certain relevant, nonprivileged, discoverable information, in violation of the referee's orders, (2) there was no doubt that the branch was prejudiced thereby, and (3) limiting the complainant's testimony and recovery to garden-variety emotional distress damages did not cure the prejudice arising from these discovery violations. The court justified its decision to vacate the award of emotional distress damages as follows: ''[The complainant] withheld clearly discoverable, nonprivileged information without justification and despite the referee's order otherwise. . . . [T]he court cannot allow such unilateral, unjustified and fundamentally unfair action to go without consequence, particularly when it prejudices the other side. . . . As a result, the court must vacate the emotional distress damage[s] award. The referee should have precluded all evidence concerning emotional and physical distress unless the proper discovery was provided. The referee's decision to allow garden-variety emotional distress evidence was made pursuant to improper procedure, was a clear error of law, and, as such, was an abuse of discretion.'' (Footnote omitted.)

We agree with the commission that the trial court's judgment rests on a flawed analysis. The following well established principles govern our review. ''This court

Connecticut Judicial Branch *v.* Gilbert

reviews the trial court's judgment pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. Under the UAPA, it is [not] the function . . . of th[e] court to retry the case or to substitute its judgment for that of the administrative agency. . . . Even for conclusions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion.'' (Internal quotation marks omitted.) *Meriden* v. *Freedom of Information Commission*, 191 Conn. App. 648, 654, 216 A.3d 847 (2019), aff'd, 338 Conn. 310, 258 A.3d 1 (2021).

''[T]he primary purpose of a sanction for [a] violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the [complainant] for [her] allegedly improper conduct. . . . The determinative question for [a reviewing] court is not whether it would have imposed a similar sanction but whether the [referee] could reasonably conclude as [she] did given the facts presented. Never will the case on appeal look as it does to a [referee] . . . faced with the need to impose reasonable bounds and order on discovery.'' (Citation omitted; internal quotation marks omitted.) *Usowski* v. *Jacobson*, 267 Conn. 73, 85, 836 A.2d 1167 (2003). ''In order for [an] order of sanctions for violation of a discovery order to withstand scrutiny, three requirements must be met. First, the order to be complied with must be reasonably clear. . . . This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review. Third, the sanction imposed must be proportional to the violation. This requirement poses a question of the discretion of the [presiding officer] that we will review for abuse of that discretion.'' (Internal quotation marks omitted.) Id.

Connecticut Judicial Branch *v.* Gilbert

The trial court appeared to rest its resolution of this issue on its view that the limitations imposed by the referee—allowing the complainant to argue for, substantiate, and recover only garden-variety emotional distress damages—were not sufficiently stringent as sanctions for what the court saw as violations of a discovery order. Neither the facts nor the law supports that conclusion.

To begin with, although the complainant clearly did not fully comply with the discovery request for the production of her medical records, she also did not actually violate any discovery order found in the record before the commission. The branch issued a broadly worded request for medical records. In response, none was provided. When the complainant submitted a list of witnesses containing the names of medical care providers, the branch objected to those witnesses. Although the dispute was apparently addressed off the record, it appears from the branch's briefing before the commission and from the referee's statements at the hearing that the complainant would be allowed, in essence, to opt either to produce her full medical records or to decline to do so and to seek only garden-variety emotional distress damages. She chose the latter course.[33] The branch has not directed our attention to anything in the record suggesting that the referee issued an unconditional order requiring production of the records.

Nevertheless, the referee's order limiting the complainant to garden-variety emotional distress damages, although not denominated a sanction by the referee, could fairly be viewed as a sanction, in that the order penalizes the complainant's failure to comply with a proper discovery demand by limiting her ability to

---

[33] By later presenting hearing testimony relating to her medical treatment, the complainant did not comply with the evidentiary limitations that accompanied her choice to seek only garden-variety emotional distress damages. See part III C of this opinion.

Connecticut Judicial Branch *v.* Gilbert

recover damages to a degree proportional to the discovery noncompliance. Cf. Practice Book 13-14 (b) (4) (authorizing trial court, in response to discovery noncompliance, to enter "an order prohibiting the party who has failed to comply from introducing designated matters in evidence"). Viewing the referee's orders as a sanction for a discovery violation, however, we are of the opinion that the trial court failed to afford appropriate deference to the referee's oversight of the discovery process. The governing regulations afford the referee broad discretion over the sanctions to be imposed for violations of her discovery orders. See Regs., Conn. State Agencies § 46a-54-89a (b) (2) ("[i]f a party fails to comply with an order of the presiding officer regarding a request for disclosure or production, the presiding officer *may* issue . . . [a]n order prohibiting the party who has failed to comply from introducing designated matters into evidence" (emphasis added)). Neither the trial court nor the branch has identified a single case in which an agency or lower court has been reversed because the sanction that it imposed for a discovery violation was *too lenient*. The cases almost universally go in the other direction—the sanctions imposed are either upheld or rejected as too draconian—and the rare exception serves only to prove the rule.[34]

[34] *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW)* v. *National Labor Relations Board,* 459 F.2d 1329 (D.C. Cir. 1972), is one of those rare cases and provides an illustrative example. The two judge majority in that case held that the National Labor Relations Board erred in not applying an adverse inference when the defendant employer repeatedly and wilfully suppressed relevant hiring records. See id., 1342–43. The majority emphasized that special statutory requirements unique to the board warranted a departure from the ordinary deference due to the fact finder in such cases, and also that it was arbitrary and capricious for the board not to apply an adverse inference when it had done so in numerous previous and virtually indistinguishable matters. See id., 1340–41. Even then, the majority afforded the defendant one last chance to produce the requested documents. Id., 1348. In his concurrence and dissent, Judge Tamm noted that the majority had failed to identify a single decision that supported reversing an administrative agency on such

Connecticut Judicial Branch *v.* Gilbert

Moreover, it is clear from the record that the referee did not consider the complainant's conduct to be egregious or in bad faith. The complainant made various efforts to find a compromise that would satisfy the branch's requests while preserving her medical privacy. See footnote 28 of this opinion. When those efforts failed, she was given a choice by the referee that allowed her to refuse production of the medical records without violating the court order. For these reasons, we cannot affirm the judgment of the trial court simply vacating altogether the award of emotional distress damages, a result that effectively substituted a severe sanction for the more moderate ruling made by the referee with oversight responsibility in the proceedings.

C

We do agree with the branch, however, that the referee improperly admitted testimony that went beyond mere garden-variety emotional distress, in seeming violation of her own rulings. We cannot conclude on this record that such error was harmless.

The precise contours of what counts as garden-variety emotional distress have not been litigated in the present case. See footnote 25 of this opinion. Even if we were to construe the concept expansively, however, testimony regarding a complainant's use of medications or counseling and other medical treatment crosses the line into treatment related emotional distress and, thus, places her medical history at issue. See, e.g., *Ruhlmann* v. *Dept. of Social Services*, 194 F.R.D. 445, 449–50 (N.D.N.Y. 2000). As we discussed, in at least four instances, the referee allowed the complainant or her husband to testify, over the objections of the branch, as to her use of various over-the-counter and prescription

grounds. See id., 1350 (Tamm, J., concurring in part and dissenting in part). We are not aware of any appellate court to have followed UAW or adopted its reasoning.

Connecticut Judicial Branch *v.* Gilbert

medications to treat her insomnia and anxiety. Although the referee struck at least one such reference from the record, the other references apparently were admitted. The referee referenced these facts in her findings, and, from her statements during the hearing, she appeared to believe that they were potentially admissible and relevant. Allowing the challenged testimony to come in when the branch had been denied access to the requested records was an abuse of discretion.

"In order to reverse an agency decision on the basis of an erroneous evidentiary ruling, it [also] is necessary that the appellant demonstrate that substantial rights . . . have been prejudiced . . . ." (Internal quotation marks omitted.) *Recycling, Inc.* v. *Commissioner of Energy & Environmental Protection*, 179 Conn. App. 127, 153, 178 A.3d 1043 (2018); see General Statutes § 4-183 (j). It is tempting to say that the referee's error in admitting evidence of the complainant's use of medications was harmless; see, e.g., *Concerned Citizens of Sterling, Inc.* v. *Connecticut Siting Council*, 215 Conn. 474, 488–89, 576 A.2d 510 (1990); insofar as the referee awarded $50,000 in damages, which falls at the lower end of what she identified as the prevailing range of awards for garden-variety emotional distress damages. See, e.g., *Lore* v. *Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) ("[t]his [c]ourt has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination whe[n] the evidence of emotional distress consisted only of [nonmedical] testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress" (internal quotation marks omitted)); *Meacham* v. *Knolls Atomic Power Laboratory*, 381 F.3d 56, 78 (2d Cir. 2004) (noting that awards of more than $100,000 often are upheld, even "without discussion of protracted suffering, truly egregious conduct, or medical treatment"), vacated on other grounds sub nom. *KAPL, Inc.* v. *Meacham*, 544

U.S. 957, 125 S. Ct. 1731, 161 L. Ed. 2d 596 (2005); *Patino* v. *Birken Mfg. Co*., 304 Conn. 679, 708, 41 A.3d 1013 (2012) ("[garden-variety] emotional distress claims generally merit $30,000 to $125,000 awards" (internal quotation marks omitted)).[35]

However, because the referee made several findings of fact regarding the complainant's need for medication, we are unable to conclude that the improperly admitted evidence did not factor into her damages calculation. On remand for a new hearing in damages, the complainant will present evidence of garden-variety emotional distress only, and the referee will assess damages in an amount deemed reasonable and appropriate in light of that evidence.[36]

IV

INJUNCTIVE RELIEF

Finally, we turn to the issue of whether the trial court properly vacated the injunction requiring that the branch "give the complainant the option of returning to the Danielson courthouse," from where she had been transferred after reporting the abuse to her superiors.[37]

---

[35] We express no opinion as to the issues presented by the pending appeal in *Commission on Human Rights & Opportunities* v. *Cantillon*, 340 Conn. 909, 909–10, 264 A.3d 94 (2021), such as whether a damages award of less than $30,000 for garden-variety emotional distress is presumptively insufficient.

[36] The branch should understand that the hearing in damages is de novo and, therefore, that the size of the award on remand may be less than, the same as, or greater than the amount of the vacated award.

[37] We note that there is some question as to whether this issue is moot. At the time of the hearing in February, 2017, the complainant testified that she had been reassigned to Danielson. Although there was some possibility that she would again be transferred from that courthouse, her supervisor had represented to her that he was going to try to keep her there. Also, in the nearly five years that have since passed, Marco has retired, and the complainant has opted not to participate in the present appeal. It is unclear, then, whether the injunctive relief at issue remains part of a live controversy. Because the parties have not represented otherwise, however, we proceed on the assumption that the issue is not moot, and we leave it to the commission to make a final determination on remand. See, e.g., *Jean-Baptiste* v. *District of Columbia*, 958 F. Supp. 2d 37, 49 (D.D.C. 2013) ("[a] request for

Connecticut Judicial Branch *v.* Gilbert

The commission contends that the injunction was authorized, if not required, by the commission's broad mandate to eliminate the effects of past discriminatory employment practices, to make victims whole, to bar like discrimination in the future, and to ensure that victims are not made to suffer further for the conduct of the sexual harasser. See, e.g., General Statutes § 46a-86 (b) ("the presiding officer shall . . . issue an order to eliminate the discriminatory employment practice complained of and to make the complainant whole"); *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, supra, 265 Conn. 140 (describing "the central statutory purposes of eradicating discrimination . . . and making persons whole for injuries suffered through past discrimination" (internal quotation marks omitted)); *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 177, 717 A.2d 1254 (1998) ("the victim of sexual harassment should not be punished for the conduct of the harasser . . . by hav[ing] to work in a less desirable location as a result of the employer's remedial plan" (citation omitted; internal quotation marks omitted)). The commission further contends that, if the trial court determined that the injunction was overly broad or founded on an insufficiently developed record, the appropriate remedy was to remand the matter to the commission to order additional briefing, to hold a new hearing, and/or to craft a more narrowly tailored injunction, rather than simply to vacate the injunction. We agree.

The following procedural history is relevant to this issue. The complainant alleged in her complaint that the branch was retaliating against her for reporting

<hr/>

an injunction will be moot only whe[n] there is no reasonable expectation that the conduct will recur, or whe[n] interim events have completely and irrevocably eradicated the effects of the alleged violation" (internal quotation marks omitted)), appeal dismissed, Docket No. 13-7124, 2014 WL 812812 (D.C. Cir. January 21, 2014).

Connecticut Judicial Branch *v.* Gilbert

Marco's harassment and sexual assaults. The referee found that, in December, 2011, after the complainant reported Marco's conduct to her supervising judicial marshal, Philip Gaudette, Gaudette "yelled at her that . . . if she kept up the emotional behavior, he would move her." The following summer, Downer reassigned the complainant from Danielson, where she had been assigned since 2006, to the Willimantic and Putnam courthouses, each of which was significantly farther from her residence. Although Downer testified that he transferred her because he needed a female marshal at those locations, the complainant testified that Downer "told her that he moved her to Putnam because she was too emotional about the Marco incidents." The referee further found that, although judicial marshals can at times be transferred between courthouses, the norm is for the branch to assign them to the courthouse closest to their homes to minimize the impacts of inclement weather. Moreover, the referee found that "[t]here are also examples of other women marshals never being transferred." Notably, although the complainant had requested that Marco, rather than she, be transferred, the branch allowed Marco to remain in Danielson after the complainant was transferred, and he was promoted to acting lead marshal there in 2014.

The referee determined that, "[w]hen the complainant continued to be upset about working with Marco, who was continuing his behavior, the [branch] ultimately transferred her to a more inconvenient location, thereby inflicting hardship on the [complainant]. . . . [Transfer] to a less desirable location . . . [is an alteration] of the conditions of her workplace." The referee ultimately concluded: "The complainant was transferred to a courthouse that was at least [one-half] hour farther away from where she was originally assigned. The [branch] argued that [it] transferred the complainant because [it] needed a female [marshal] at another

Connecticut Judicial Branch *v.* Gilbert

courthouse. *Given the timing and frustration with the complainant's upset regarding working with Marco, it is unlikely that is the only or main reason for her transfer.*'' (Emphasis added.)

The trial court vacated the injunction. The court concluded that the order ''is clearly an abuse of discretion,'' ''an error of law,'' and ''not properly tailored,'' because it (1) is unnecessary to achieve the purposes of the state's antidiscrimination statutes and to prevent further discriminatory conduct, insofar as Marco is no longer stationed at Danielson,[38] (2) infringes on the discretion of the branch to assign the complainant and other judicial marshals to the courthouse of its choosing on the basis of its operational needs, and (3) places no time limitation on how long the branch must continue to assign the complainant to Danielson.

Our review is governed by the following well established principles. As the trial court recognized, § 46a-86 (a) clearly grants the commission the authority to issue reasonable injunctive relief tailored to eliminating the discriminatory practice and its effects.[39] An order of the commission may be reversed on appeal only when that order is ''(1) [i]n violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion

[38] Marco retired as a judicial marshal in 2020.

[39] General Statutes § 46a-86 (a) provides in relevant part that ''[i]f, upon all the evidence presented at the hearing . . . the presiding officer finds that a respondent has engaged in any discriminatory practice, the presiding officer shall make written findings of fact and file with the commission and serve on the complainant and respondent an order requiring the respondent to cease and desist from the discriminatory practice and to take such affirmative action as is necessary to achieve the purpose of this chapter.''

or clearly unwarranted exercise of discretion.'' General Statutes § 4-183 (j); see *Hiraldo-Cancel* v. *Aponte*, 925 F.2d 10, 13 (1st Cir.) (''[R]einstatement is an equitable remedy [that] is reviewed for abuse of discretion. . . . Considerable deference is accorded a reinstatement order, as the [referee] has had [firsthand] exposure to the litigants and the evidence . . . [and] is in a considerably better position to bring the scales into balance than an appellate tribunal.'' (Citation omitted; internal quotation marks omitted.)), cert. denied, 502 U.S. 1004, 112 S. Ct. 637, 116 L. Ed. 2d 655 (1991).

In view of these principles, although we share the concerns expressed by the trial court, we find none sufficient to warrant the court's decision to simply vacate the injunction as a matter of law. With respect to the first point raised by the court, it is true that Marco's retirement eliminated any possibility that the complainant might be assigned to a courthouse where she would have to serve alongside him. The primary purpose for reinstating an employee who is transferred after complaining of sexual harassment, however, is to vindicate the important public policy against punishing or retaliating against victims who report abuse. See, e.g., *Ellison* v. *Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (''[w]e strongly believe that the victim of sexual harassment should not be punished for the conduct of the harasser . . . [by having] to work in a less desirable location''); *Jean-Baptiste* v. *District of Columbia*, 958 F. Supp. 2d 37, 51 (D.D.C. 2013) (issuing permanent injunction even though defendant no longer employed alleged abuser), appeal dismissed, Docket No. 13-7124, 2014 WL 812812 (D.C. Cir. January 21, 2014). That purpose was served by the referee's order regardless of Marco's particular circumstances at the time relief was granted.

The trial court made clear that its ruling vacating the injunction was predicated on the assumption that the

Connecticut Judicial Branch *v.* Gilbert

complainant's superiors did not transfer her out of any retaliatory intent.[40] This conclusion is contrary to the referee's factual findings. Although the referee did not use language containing an explicit finding that the complainant was transferred in retaliation for her complaint, the referee strongly implied that such was the case when she marshaled the relevant evidence of retaliation and concluded that "it is unlikely that [the branch's stated rationale] is the only or main reason for her transfer." The referee's factual findings leading to this statement and expressing disbelief in the branch's proffered explanation—including Gaudette's threats of reassignment expressly linked to the complainant's "emotional behavior" and Downer's explanation to the complainant that the reassignment was due to her "emotional" reaction to the Marco incidents—overwhelmingly point to a retaliatory animus. For all intents and purposes, these factual findings, read fairly, amount to a determination by the referee that the transfer was pretextual and retaliatory. See, e.g., *Richardson* v. *Dept. of Correctional Service*, 180 F.3d 426, 444 (2d Cir. 1999) (transfer and reassignment to less favorable work location following complaint of employment discrimination constitute prima facie evidence of retaliation). If we are correctly construing the referee's findings in this respect, then the primary assumption underlying the trial court's decision to vacate the injunction was incorrect. On remand, the referee will have the opportunity to clarify, in express terms, whether she finds that the transfer was most likely retaliatory and not merely an ordinary operational decision made on the basis of legitimate, nonretaliatory considerations.

[40] Specifically, the trial court stated in its memorandum of decision that the injunction "unnecessarily and unreasonably impinges on the right of the [branch] to assign [the complainant] to a location where she is needed, *absent, of course, any retaliatory intent.*" (Emphasis added.) The court offered no support for its assumption that the transfer was not retaliatory and did not address the referee's relevant findings to the contrary.

Connecticut Judicial Branch *v.* Gilbert

If, in fact, the branch sought to retaliate against the complainant or to resolve the pattern of harassment and abuse by transferring her to a less convenient location while allowing her abuser to remain in Danielson, then the trial court's second rationale for vacating the injunction also falls by the wayside. If retaliatory animus motivated the decision, it is irrelevant that, under ordinary circumstances, the branch, as the employer, has the discretion to assign judicial marshals to the workplace of its choosing, and that the employee cannot refuse such a transfer or insist on being reassigned to a former workplace.[41] Connecticut, like other jurisdictions, has articulated a clear public policy against punishing victims of sexual harassment and assault by involuntarily transferring the victim, rather than the perpetrator, either to resolve the situation or as retaliation for reporting.[42] When such an improper transfer has occurred,

---

[41] The branch misses the point when it observes that judicial marshals are not afforded "the privilege of selecting [their] preferred work location." The injunction does not give the complainant the option to select any courthouse or her preferred courthouse. The injunction requires merely that the branch permit her to return to the specific courthouse to which the branch itself had assigned her (evidently consistent with branch policy) for many years prior to the act of retaliation. See *Dean* v. *Civiletti*, 670 F.2d 99, 101 and n.2 (8th Cir. 1982) (victim of discrimination would be entitled to assignment to geographic station from which she had been wrongly excluded but not to station of her choosing).

[42] For example, § 46a-60 (8) provides in relevant part: "If an employer takes immediate corrective action in response to an employee's claim of sexual harassment, such corrective action shall not modify the conditions of employment of the employee making the claim of sexual harassment unless such employee agrees, in writing, to any modification in the conditions of employment. 'Corrective action' taken by an employer, includes, but is not limited to, employee relocation . . . ." Subdivision 4 of § 46a-60 further provides in relevant part that it shall be a discriminatory practice "[f]or any . . . employer . . . to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding [regarding an alleged discriminatory employment practice] . . . ." See generally *Burlington Northern & Santa Fe Railway Co.* v. *White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (construing broadly antiretaliation provision of Title VII).

affording the victim the opportunity to return to his or her former workplace, or "rightful place," is the preferred means of vindicating that policy. (Internal quotation marks omitted.) *Parson* v. *Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1391 (5th Cir. 1978), cert. denied sub nom. *Local 13000, United Steelworkers of America, AFL-CIO-CLC* v. *Parson*, 441 U.S. 968, 99 S. Ct. 2417, 60 L. Ed. 2d 1073 (1979); see, e.g., *Reeves* v. *Board of Education*, 828 F.2d 1096, 1101–1102 (5th Cir. 1987); *McGill* v. *Board of Education*, 602 F.2d 774, 776 (7th Cir. 1979); see also *Nord* v. *United States Steel Corp.*, 758 F.2d 1462, 1473 (11th Cir. 1985) ("Title VII claimants are . . . presumptively entitled to reinstatement under the 'make whole' policy"); *Stewart* v. *General Motors Corp.*, 756 F.2d 1285, 1291 (7th Cir. 1985) (remedial injunction simply protects complainant's preexisting right to be treated equally with other employees).

This is not to say that logistical considerations are wholly irrelevant in fashioning proper relief. Before ordering the branch to reinstate the complainant, the referee must consider factors such as (1) whether, and to what extent, the branch's relocation of the complainant to other courthouses since 2012 departs from the norms that have applied to other marshals; see, e.g., *Stolzenburg* v. *Ford Motor Co.*, 143 F.3d 402, 407 (8th Cir. 1998); see also *Chace* v. *Champion Spark Plug Co.*, 732 F. Supp. 605, 610 (D. Md. 1990) (ordering reinstatement with same salary and benefits as are accorded to other employees); (2) what impact keeping the complainant at Danielson will have on the operational needs of the branch and whether any imposition in that regard will outweigh the benefit to her of being assigned to a courthouse closer to her home; see, e.g., *Equal Employment Opportunity Commission* v. *Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 836 (6th Cir. 1997) (remanding for balancing of equities prior to reinstatement); *Hira-*

*ldo-Cancel* v. *Aponte*, supra, 925 F.2d 14 (deferring to District Court's balancing of equities); *Patrolmen's Benevolent Assn. of City of New York, Inc.* v. *New York*, Docket Nos. 97 CIV. 7895 (SAS) and 98 CIV. 8202 (SAS), 2000 WL 1538608, *3 (S.D.N.Y. October 18, 2000) (concluding that judicial interference via injunction would interfere with internal operations and could diminish efficacy of response of New York City Police Department), aff'd, 310 F.3d 43 (2d Cir. 2002), cert. denied, 538 U.S. 1032, 123 S. Ct. 2076, 155 L. Ed. 2d 1061 (2003); (3) whether reinstating her at Danielson did or will require the reassignment of any innocent employees; see, e.g., *Hicks* v. *Board of Education*, 814 F. Supp. 1044, 1050 (M.D. Ala. 1993) (setting forth factors to be considered in deciding whether to issue injunction that would require "bumping" innocent employee in order to reinstate prevailing complainant); and (4) to what extent the facts on the ground now differ from what they were at the time of the hearing. See, e.g., *Parson* v. *Kaiser Aluminum & Chemical Corp.*, supra, 575 F.2d 1390 ("practices may have altered since this case was first tried"); *Chace* v. *Champion Spark Plug Co.*, supra, 609 ("intervening historical circumstances can make [reinstatement] impossible or inappropriate"); *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, supra, 265 Conn. 137 ("reinstatement may be impractical, imprudent or even impossible").

Likewise, with respect to the trial court's third concern, the apparently unbounded nature of the injunction, the commission on remand should clarify the scope and duration of the injunction, bearing in mind the following principles: "A party moving for [a permanent] injunction [under Title VII] must show (1) she has suffered irreparable injury, (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) considering the balance of hardships between the plaintiff and [the] defendant,

Connecticut Judicial Branch *v.* Gilbert

a remedy in equity is warranted and (4) the public interest would not be disserved by a permanent injunction. . . . The . . . necessary determination is that there exists some cognizable danger of recurrent violation.'' (Citations omitted; internal quotation marks omitted.) *Pierce* v. *Philadelphia*, 391 F. Supp. 3d 419, 445 (E.D. Pa. 2019), aff'd, 811 Fed. Appx. 142 (3d Cir. 2020); see *Howe* v. *Akron*, 801 F.3d 718, 754 (6th Cir. 2015) (''permanent injunctions should be tailored to redress the harm without hamstringing local government''); *Equal Employment Opportunity Commission* v. *Creative Networks, LLC*, 912 F. Supp. 2d 828, 846 (D. Ariz. 2012) (''[p]ermanent injunctive relief is warranted [when the] . . . defendant's past and present misconduct indicates a strong likelihood of future violations'' (internal quotation marks omitted)). If the commission determines that the scope of the branch's misconduct and the balance of the equities do not warrant an order that permanently precludes the branch from reassigning the complainant, then the commission should specify at what point or under what circumstances the injunction will expire. See, e.g., *Howe* v. *Akron*, supra, 754–55 (modifying permanent injunction to extend for one promotional cycle); *Equal Employment Opportunity Commission* v. *Service Temps, Inc.*, 679 F.3d 323, 338–39 (5th Cir. 2012) (limiting remedial injunction to two years); *Locke* v. *Kansas City Power & Light Co.*, 660 F.2d 359, 368 and n.11 (8th Cir. 1981) (recommending that District Court retain jurisdiction over matter for six months following reinstatement of complainant, during which employer would ''carry the burden of persuasion that any dismissal of [the complainant] is based entirely on legitimate, nondiscriminatory factors''). And, lastly, any order should specify whether, during the course of the injunction, the branch may continue to assign the complainant to other courthouses on a short-term basis consistent with its operational needs and norms. See,

Connecticut Judicial Branch *v.* Gilbert

e.g., *Vega* v. *Chicago Park District*, 351 F. Supp. 3d 1078, 1087 (N.D. Ill. 2018) (defendant was required to apply same policies to complainant as are applied to other employees), aff'd, 954 F.3d 996 (7th Cir. 2020).

On remand, the referee will have the opportunity to make the necessary findings and, if appropriate, to issue a new injunction consistent with those findings and with established law. See, e.g., *Brown* v. *Dept. of Transportation*, 597 F.3d 1160, 1186 (11th Cir. 2010) (holding that District Court had authority to order complainant transferred to comparable position nearest her residence but remanding case for court to state with greater clarity and specificity how injunction was to be carried out).

The judgment is reversed with respect to the award of prejudgment and postjudgment interest, and emotional distress damages, and with respect to the order of injunctive relief, the award of prejudgment and post judgment interest is vacated, and the case is remanded for further proceedings consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.